FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

APR 28 2023

MITCHELL R. ELFERS
CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JARRODLOWREY,

        Plaintiff,

vs.

Jury Trial Demanded

Case No.

RIO RANCHO POLICE OFFICER DAVID PORTIS (RRPD 3822)
in his official and individual capacities,

RIO RANCHO POLICE OFFICER PHILLIP GALLEGOS (RRPD 5015)
in his official and individual capacities,

RIO RANCHO POLICE OFFICER N. ARMY (RRPD 3535)
in his official and personal capacities,

RIO RANCHO POLICE OFFICER BEN PARKER (RRPD 5347)
in his official and personal capacities,

RIO RANCHO POLICE OFFICER JOHN CHRISTOPHER MILES (RRPD 5510)
in his official and personal capacities,

RIO RANCHO POLICE OFFICER JOHNATHAN HICKERSON (RRPD 4132)
in his official and personal capacities,

RIO RANCHO POLICE CVAU OFFICER MARIE POSEY,
in her official and personal capacities

CHERYL H. JOHNSTON,
in her official capacity,

jointly and severally.

        Defendants.

## PLAINTIFF'S CIVIL RIGHTS COMPLAINTS

NOW COMES the Plaintiff, Jarrod Lowrey, to hereby complain against the above named

defendants as follows:

1

## JURISDICTION AND VENUE

Plaintiff now brings this complaint under 42 U.S.C. Section 1983 and the New Mexico Civil

Rights Act (2021) for damages and injunctive prospective relief resulting from the deprivation of civil

rights inflicted upon Plaintiff by the Defendants.  The court has jurisdiction of this action under 42

U.S.C. Section 1983, 28 U.S.C. Section 1331, 28 U.S.C. Section 1343 and of the parties.  Venue is

proper in this judicial district as the incidents complained of occurred in New Mexico.

At all times material to this lawsuit, the 7 police officer defendants listed above acted within the

course and scope of their duties as public employees, were state actors, and acted under the color of the

law.  Defendant Cheryl H. Johnston, acting in her official capacity, as a state judge, was a state actor,

and acted under the color of law.  Plaintiff alleges as follows:

## PARTIES TO COMPLAINT

1.      Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

2.      Plaintiff Jarrod Lowrey is a private individual who lives in the city of Rio Rancho, New

Mexico.

3.      At all times relative to this complaint, Police Officer Dave Portis, was an employee of

the City of Rio Rancho through the City of Rio Rancho Police Department.

4.      At all times relative to this complaint, Police Officer Phillip Gallegos, was an employee

of the City of Rio Rancho through the City of Rio Rancho Police Department.

5.      At all times relative to this complaint, Police Officer N. Army, was an employee of the

City of Rio Rancho through the City of Rio Rancho Police Department.

6.      At all times relative to this complaint, Police Officer Ben Parker, was an employee of the

2

City of Rio Rancho through the City of Rio Rancho Police Department.

7.      At all times relative to this complaint, Police Officer John Christopher Miles, was an employee of the City of Rio Rancho through the City of Rio Rancho Police Department.

8.      At all times relative to this complaint, Police Officer Johnathan Hickerson, was an employee of the City of Rio Rancho through the City of Rio Rancho Police Department.

9.      At all times relative to this complaint, Police Officer Marie Posey, was an employee of the City of Rio Rancho through the City of Rio Rancho Police Department.

10.     At all times relative to this complaint, Cheryl H. Johnston, was a New Mexico State District Court Judge, acting in her official capacity.

## GENERAL FACTS

1.      Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

2.      The incidents and counts complained of therein this complaint occurred between July 1, 2021-to present day, and should be considered ongoing.

3.      Plaintiff's complaints arise out of the fact that his Constitutional Rights have been violated by the Rio Rancho Police Department (RRPD) for years without any just cause or due process.

4.      Plaintiff has endured years of malicious prosecution at the hands of RRPD officers , who have tried to paint Plaintiff out to be a dangerous criminal, including flagging his name in their CAD system.

5.      Despite the above statement, Plaintiff has never once been called for even one interview by any RRPD officer or detective.  Nor has Plaintiff ever been convicted of any crime in his entire life.

6.      Plaintiff's complaint is not a single incident complaint and involves the actions of the above defendants, severally and individually, on different dates of occasion.

7.      Plaintiff has never, in any way, given RRPD officers a reason to behave in the manner

that they have behaved towards him.

8.    Despite the above statements Judge Cheryl Johnston, and the RRPD, and it's officers, above named, have left Plaintiff no choice but to file this complaint as a last resort.

9.    Plaintiff's complaint is not in any way filed in bad faith nor has it been constructed without full consideration of the facts provable through video exhibits and documentation already in his possession, which will be concurrently filed with the court as exhibits.

10.    Plaintiff's complaints and counts herein cannot presently be remedied through New Mexico courts, as all paths of remedy have been blocked by the unlawful actions by the above defendants, who themselves, are the gatekeepers of any path of any in-state remedy for Plaintiff.  Given that fact, the above defendants cannot further be considered as viable paths of remedy to any of Plaintiff's following complaints.

11.    Plaintiff is a mere private citizen with no influential power to challenge the above named authorities as the premiere power holders of the city and county that he resides in.  If Plaintiff was to make these same complaints locally, they would be made to the above defendants, which would likely only lead to further deprivations of Plaintiff's rights.

12.    Given the above statement, Plaintiff now contends that the above defendants have conspired to strip Plaintiff of his federally and state protected rights, which are not granted to Plaintiff by any of the above named defendants, but are inherently granted by God.

13.    Plaintiff now contends that his Constitutional Rights are not being observed on the state level, and therefore this Federal Court has the authority to enforce the above defendant's compliance to observe Plaintiff's federal and statutory rights by law.

14.    Plaintiff proceeds pro se, and so he asks the Court to read his complaint liberally.

15.    At current, Plaintiff is scared for his safety, and respectfully implores that the Court consider the merits of his complaint over considering the technical aspects of this complaint.

4

16.    Plaintiff has read the Federal Rules and he believes that his complaint meets the minimal pleading requirements.

17.    RRPD officers and Judge Cheryl H. Johnston are at the center of this complaint.  Any other characters will go unnamed for legal purposes, as they should be considered merely ancillary components of the facts and circumstances which led to the above named defendants to deprive Plaintiff of his Constitutional Rights listed herein.

18.    The above mentioned unnamed characters will go anonymous as to protect them from unnecessary embarrassment, but the facts will nonetheless be delivered in this complaint.

19.    Plaintiff is a co-parent with his child's mother, whom he has not lived with since 2017. Plaintiff has a custody order with his co-parent which specifies he has the shared child from Tuesday at 4 pm. until Fridays at 6:15 pm.   That custody order was signed by defendant Judge Cheryl H. Johnston.

20.    Plaintiff is in no way asking this court for relief or an injunction to make any changes to his custody order.  Plaintiff only asks the Court to immediately address the Constitutional deprivations that have already transpired by the above defendants, and also for prospective relief for ongoing deprivations of his Constitutional Rights by the above defendant, Cheryl H. Johnston.

21.    Plaintiff is no way aiming to cause undue embarrassment to his child's mother by filing this complaint, and so she will further be mentioned as "JR".  The only reason that Plaintiff is mentioning her in this complaint is because if he did not, it would be prejudicial to his complaint and he would be left with no path of remedy to address the current conspiracy by the above defendants to deprive Plaintiff of his Constitutional Rights.

22.    Plaintiff has made multiple visits to the RRPD police station and has discussed these following deprivations many different supervisory officers.  Plaintiff has provided the Court with records of those visits.

## SHORT AND PLAIN STATEMENT

1.    **COUNT 1:** RRPD Officer Johnathan Hickerson was called out on a welfare check of Plaintiff's missing child on October 22, 2021 in Rio Rancho,NM.  Officer Hickerson completely failed to locate the child but instead maliciously retaliated against Plaintiff for calling in a welfare check by conspiring to advise child's mother and friend to file fabricated stalking charges against Plaintiff. Officer Hickerson denied Plaintiff his 14th Rights to be treated equally under the law.  This unequal treatment under the law has caused Plaintiff much physical and emotional distress and is ongoing.

2.    **COUNT 2**: RRPD Officers Dave Portis, Phillip Gallegos, and N. Army, above named defendants, failed to uphold Plaintiff's lawful court order of the New Mexico 13th District Court of Sandoval County, unlawfully seized Plaintiff's child, intentionally omitted available evidences, fabricated evidences, and conspired with Judge Cheryl H. Johnston and other RRPD officer defendants to unlawfully seize Plaintiff's child on June 21, 2022 at La Petite Daycare on Quantum Road in Rio Rancho, NM.  Above Defendants deprived Plaintiff of his 14th Amendment Rights to be treated equally under the law.  This unequal treatment under the law has caused Plaintiff much physical and emotional distress and is ongoing.

3.    **COUNT 3:** RRPD David Portis, above named defendant, failed to uphold Plaintiff's lawful court order of the New Mexico 13th District Court of Sandoval County, unlawfully seized Plaintiff's child, intentionally omitted available evidences, fabricated evidences, and conspired with Judge Cheryl H. Johnston and other RRPD officer defendants to illegally seize Plaintiff's child on June 21, 2022 at La Petite Daycare on Quantum Road in Rio Rancho, NM.  David Portis, above named, deprived Plaintiff of his 14th Amendment Right by interfering with his parent/child relationship.  This parent/child interference has caused Plaintiff much physical and emotional distress and is ongoing.

4.    **COUNT 4:** RRPD Phillip Gallegos, above named defendant, failed to uphold

6

Plaintiff's lawful court order of the New Mexico 13th District Court of Sandoval County, unlawfully seized Plaintiff's child, intentionally omitted available evidences, fabricated evidences, and conspired with Judge Cheryl H. Johnston and other RRPD officer defendants to illegally seize Plaintiff's child on June 21, 2022 at La Petite Daycare on Quantum Road in Rio Rancho, NM. Phillip Gallegos, above named, deprived Plaintiff of his 14th Amendment Right by interfering with his parent/child relationship. This parent/child interference has caused Plaintiff much physical and emotional distress and is ongoing.

5.    **COUNT 5:** RRPD N. Army, above named defendant, failed to uphold Plaintiff's lawful court order of the New Mexico 13th District Court of Sandoval County, unlawfully seized Plaintiff's child, intentionally omitted available evidences, fabricated evidences, and conspired with Judge Cheryl H. Johnston and other RRPD officer defendants to illegally seize Plaintiff's child on June 21, 2022 at La Petite Daycare on Quantum Road in Rio Rancho, NM. N. Army, above named, deprived Plaintiff of his 14th Amendment Right by interfering with his parent/child relationship. This parent/child interference has caused Plaintiff much physical and emotional distress and is ongoing.

6.    **COUNT 6:** RRPD David Portis, above named defendant, failed to uphold Plaintiff's lawful court order of the New Mexico 13th District Court of Sandoval County, unlawfully seized Plaintiff's child, intentionally omitted available evidences, fabricated evidences, and conspired with Judge Cheryl H. Johnston and other RRPD officer defendants to illegally seize Plaintiff's child on June 21, 2022 at La Petite Daycare on Quantum Road in Rio Rancho, NM. David Portis, above named, deprived Plaintiff of his 4th Amendment Right to be free of unreasonable seizure of his 1st liberty interest. This unlawful seizure has caused Plaintiff much physical and emotional distress and is ongoing.

7.    **COUNT 7**: RRPD David Portis, above named defendant, failed to uphold Plaintiff's lawful court order of the New Mexico 13th District Court of Sandoval County, unlawfully seized Plaintiff's child, intentionally omitted available evidences, fabricated evidences, and conspired with

Judge Cheryl H. Johnston and other RRPD officer defendants to illegally seize Plaintiff's child on June 21, 2022 at La Petite Daycare on Quantum Road in Rio Rancho, NM. David Portis, above named, deprived Plaintiff of his 14th Amendment Right by deliberately fabricating evidence. This deliberate fabrication of evidence has caused Plaintiff much physical and emotional distress and is ongoing.

8.    **COUNT 8:** RRPD Phillip Gallegos, above named defendant, failed to uphold Plaintiff's lawful court order of the New Mexico 13th District Court of Sandoval County, unlawfully seized Plaintiff's child, intentionally omitted available evidences, fabricated evidences, and conspired with Judge Cheryl H. Johnston and other RRPD officer defendants to illegally seize Plaintiff's child on June 21, 2022 at La Petite Daycare on Quantum Road in Rio Rancho, NM. Phillip Gallegos, above named, deprived Plaintiff of his 14th Amendment Right by deliberately fabricating evidence. This deliberate fabrication of evidence has caused Plaintiff much physical and emotional distress and is ongoing.

9.    **COUNT 9:** RRPD N. Army, above named defendant, failed to uphold Plaintiff's lawful court order of the New Mexico 13th District Court of Sandoval County, unlawfully seized Plaintiff's child, intentionally omitted available evidences, fabricated evidences, and conspired with Judge Cheryl H. Johnston and other RRPD officer defendants to illegally seize Plaintiff's child on June 21, 2022 at La Petite Daycare on Quantum Road in Rio Rancho, NM. N. Army, above named, deprived Plaintiff of his 14th Amendment Right by deliberately fabricating evidence. This deliberate fabrication of evidence has caused Plaintiff much physical and emotional distress and is ongoing.

10.    **COUNT 10:** RRPD Detective Ben Parker failed to properly investigate a claim of child abuse, maliciously filed charges against Plaintiff, fabricated evidences, and omitted exculpatory evidences from his investigations. Ben Parker, above named, treated Plaintiff unequal to JR throughout his investigations and in doing so deprived Plaintiff of his 14th Amendment Rights to be treated equally under the law. This unequal treatment has caused Plaintiff much physical and emotional distress and is ongoing.

11.    **COUNT 11:** RRPD Detective John Christopher Miles failed to properly investigate a claim of child abuse, maliciously filed charges against Plaintiff, fabricated evidences, and omitted exculpatory evidences from his investigations. John Christopher Miles, above named, treated Plaintiff unequal to JR throughout his investigations and in doing so deprived Plaintiff of his 14th Amendment Rights to be treated equally under the law. This unequal treatment has caused Plaintiff much physical and emotional distress and is ongoing.

12.    **COUNT 12:** RRPD Detective Ben Parker failed to properly investigate a claim of child abuse, maliciously filed charges against Plaintiff, fabricated evidences, and omitted exculpatory evidences from his investigations. Ben Parker, above named, maliciously prosecuted Plaintiff without any evidence and therefore deprived Plaintiff of his 4th Amendment Rights, and that prosecution was favorably decided in Plaintiff's favor. This malicious prosecution has caused Plaintiff much physical and emotional distress and is ongoing.

13.    **COUNT 13:** RRPD John Christopher Miles failed to properly investigate a claim of child abuse, maliciously filed charges against Plaintiff, fabricated evidences, and omitted exculpatory evidences from his investigations. John Christopher Miles, above named, maliciously prosecuted Plaintiff without any evidence and therefore deprived Plaintiff of his 4th Amendment Rights, and that prosecution was favorably decided in Plaintiff's favor. This malicious prosecution has caused Plaintiff much physical and emotional distress and is ongoing.

14.    **COUNT 14:** RRPD CVAU Officer Marie Posey denied equal treatment to Plaintiff on April 19, 2023. RRPD CVAU has given preferential treatment to JR without reason, and that same CVAU, including Marie Posey, have failed to treat Plaintiff with the same standards. Marie Posey, above named, deprived Plaintiff of his 14th Amendment Right to be treated equally under the law. This unequal treatment has caused Plaintiff much physical and emotional distress and is ongoing.

15.    **COUNT 15:** Judge Cheryl H. Johnston conspired with the RRPD officers Dave Portis,

Phillip Gallegos, and N. Army to illegally seize Plaintiff's child.  Cheryl H. Johnston acted without

jurisdiction of New Mexico Courts after hours through an out of court ex-parte communication with the

above mentioned RRPD officers.  Without ascertaining any exigent circumstances, Judge Cheryl H.

Johnston lied to the officers and broke New Mexico and Federal Laws.  Then unlawfully engaged a

cover up in her own Court to suppress her unlawful ex-parte actions.  Cheryl H. Johnston, above

named, deprived Plaintiff of his 14th Amendment Rights by interfering in his Parent/Child Relationship.

This parent/child interference has caused Plaintiff much physical and emotional distress and is ongoing

to this day.  This claim by Plaintiff is an Ex Parte Young Claim against the above named defendant.

## COUNT 1

Unequal Treatment Under The Law

Equal Protection Clause 14th Amendment

New Mexico Constitution Article 2 Section 4, 14 & 18

New Mexico Constitution Article 3 Section 1

New Mexico Human Rights Act

Civil Rights Act of 1964 (Title VII)

New Mexico Civil Rights Act (2021)

RRPD Standards and Procedures Manual

***Alleghany Pittsburgh Coal Co. v. Commission of Webster City, 488 U.S 336 (1989)***

Defendant: RRPD Johnathan Hickerson

**October 22, 2021 (CAD# 21-12156)**

1.       Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

2.       Officer Hickerson was dispatched to a welfare check of  Plaintiff's minor child on

October 22, 2021 about 11 pm.  Hickerson never located Plaintiff's child.

3.       Rather than locate the child, Hickerson called Plaintiff and accused him of wasting his

time.  In retaliation, Hickerson then said he was driving to the child's mother's home to to file a stalking

and harassment report against Plaintiff.

4.       Plaintiff was at his home during the whole time of this incident.

5.       Hickerson never located the child and thus never completed the welfare check he was

dispatched to perform.

6.    In fact, Plaintiff's child never made it back to Rio Rancho that night.  Hickerson had no idea what address the child was at when he closed the welfare check call.

7.    Hickerson broke RRPD Procedure manual protocols by failing to perform his duty as dispatched and placed Plaintiff's minor child in a dangerous situation.

8.    Hickerson treated Plaintiff unfairly and the evidence shows he gave preferential treatment to the child's mother over Plaintiff for no clear reason to do so.

9.    Defendant listed above acted willfully, knowingly, and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights.  As a result of the nature of Defendant's conduct, Plaintiff is entitled to recover punitive damages against the individual Defendant.

10.    This unequal treatment under the law has caused Plaintiff much physical and emotional distress over the years and is ongoing.


### COUNT 2
Unequal Treatment Under The Law

Equal Protection Clause 14th Amendment

New Mexico Constitution Article 2 Section 4 & 18

New Mexico Constitution Article 3 Section 1

New Mexico Human Rights Act

Civil Rights Act of 1964 (Title VII)

New Mexico Civil Rights Act (2021)

RRPD Standards and Procedures Manual

**Alleghany Pittsburgh Coal Co. v. Commission of Webster City, 488 U.S 336 (1989)**

Defendant's: David Portis, Phillip Gallegos, N. Army (severally or individually)

**La Petite Daycare, Quantum Rd., Rio Rancho, NM - June 21, 2022 (CAD # 22-04855)**


1.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

2.    On June 21, 2022, about 4 pm. Plaintiff arrived at La Petite Daycare on Quantum Rd. in Rio Rancho to pick up his child as outlined by his New Mexico District court order. Plaintiff called RRPD to do a civil standby.

3.     Plaintiff made this call because a similar civil standby had taken place on March 5, 2021 in which Plaintiff was ordered to comply with the same court order by RRPD Officer Wysong.

4.     On June 21, 2022 RRPD Officer Phillip Gallegos was dispatched to the scene and Plaintiff showed the court order to the officer and he refused to enforce it.

5.     Gallegos then called RRPD Officer David Portis to the scene about 6:50 pm. Officer Portis then also refused to enforce Plaintiff's court order.

6.     Portis then called RRPD Officer N. Army to the scene about 7:30 pm. Officer N. Army then also refused to enforce Plaintiff's court order.

7.     Portis told Plaintiff they would not enforce the court order because it was a civil order.

8.     Plaintiff has provided the Court with the officers lapel videos which show each of the officers admitting that there were no exigent circumstances or safety risks to the child.

9.     Just 14 months earlier, on March 5, 2021, when the child's mother called for a civil standby, RRPD quickly enforced the court order despite being given New Mexico state documents showing meth use in the mothers home.

10.     When father calls for the same civil standby with the same court order at the very same location, all of the sudden it takes four hours and he is told that the court order is just a civil order not enforceable by RRPD, and eventually ends in a most unreasonable seizure of Plaintiff's child.

11.     This unequal treatment under the law has caused Plaintiff much physical and emotional distress over the years and is ongoing.

12.     Defendants listed above acted willfully, knowingly, and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights. As a result of the nature of Defendant's conduct, Plaintiff is entitled to recover punitive damages against the individual Defendants.

**COUNT 3**

12

Interference with Parent Child Relationship

14th Amendment

New Mexico Constitution Article 2 Sections 4, 14, & 18

Civil Rights Act (2021)

RRPD Standards and Procedures Manual

**Santosky v. Kramer, 455 U.S. 745, 102 S. Ct. 1388**

Defendant: David Portis

June 21, 2022

at La Petite Daycare Parking Lot (**CAD# 22-004855**)

1.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

2.    David Portis is called by Phillip Gallegos to the scene of a civil standby in which Plaintiff has requested the RRPD to facilitate the pickup of his child per his New Mexico District court order.  Portis arrives on the scene at around 6:50 pm.

3.    Upon arrival on scene Plaintiff fully informs Portis of the court order and the unsigned safety plan and how it is a fraudulent document.  Portis can be seen on his own lapel camera videos stating that the safety plan is "*terrible*".

4.    After talking with Plaintiff and child's mother, further referred to as "JR", Portis can be seen on his lapel camera videos doubting the validity of the CYFD safety plan because it was unsigned.

5.    Portis can be viewed on his own videos doubting the truthfulness of the CYFD caseworker saying,"*She has not been helpful at all*".

6.    Portis can be viewed on his own videos doubting the truthfulness of the minor child's mother.

7.    Portis can be viewed on his own videos failing to inform Judge Johnston that the safety plan was given to plaintiff by threat of bodily harm and that it was unsigned by either parent.

8.    Portis can be seen on his own video saying to Plaintiff that the Judge was not going to

issue an order to seize the child.

9.     Portis can be viewed on the video being told by Lead Detective Mahnesmith that there is no investigation currently into Plaintiff or his minor child.

10.     Portis can be viewed being told by Mahnesmith that she doesn't see how CYFD even got to a safety plan.

11.     Portis can be seen on his video being told by Army,"*So we don't necessarily think the child was going to be in any sort of physical danger or think he is gonna flee to Texas or coach the child*".

12.     Portis can be seen on the video lying to Plaintiff when questioned whether he told the Judge the safety plan wasn't signed and he says,"*Yep*".

13.     Portis can be viewed on his video hearing the caseworker say "*I don't know*" when questioned if she thinks the child will be harmed by Plaintiff.

14.     Portis can be viewed on his video hearing the caseworker tell him about the safety plan,"*from the beginning, excuse my language, but it's (safety plan) been fucked up*."

15.     Portis can be heard on his own video saying,"*She (caseworker) believes the child is in danger, but what I'm not seeing is enough for me to prove the child is in danger. I'm not discrediting her (caseworker) but I'm just saying I don't have it (proof) in front of me*."

16.     Portis can be viewed on his video saying,"*She (caseworker) believes the child is in danger based off facts that I am not getting...other that the fact that he (Plaintiff) is who he is*."

17.     Portis can be seen on his own video facilitating the defrauding of a CYFD state document when he asks the caseworker if she has the ,"*correct dates and signatures and all that good stuff*".

18.     Portis can be seen on his own video fabricating evidence with the two other officers that they all of the sudden think the child is in danger.

19.    Portis can be seen on his own video saying he doesn't see enough evidence for a 48 hour hold, but seizes the child for 21 days.

20.    Portis can be seen on his own video disparaging Plaintiff in front of everyone, including his child's mother, on several different occasions.

21.    Portis can be seen on his video telling the child's mother,"***You are going to have to find the balance of him (Plaintiff) not contacting the child and hiding the child from him .***"

22.    Portis can be heard saying on his video that the Judge told him everyone on the scene is going to be named in a lawsuit, including the Judge for calling him.

23.    Portis can be seen on his own video saying,"***Let's grab the kid***".

24.    Plaintiff can be seen Portis' video on multiple occasions telling the officers that they are violating Plaintiff's due process rights.

25.    RRPD Officer Dave Portis, knowing that the safety plan was an unofficial document, knowing that it was given to Plaintiff under duress, knowing that a safety plan is a voluntary agreement that Plaintiff never agreed to, knowing that the Judge was not going to issue an order or warrant, and knowing that he and the other RRPD officers on scene saw no safety concerns, unreasonably seized Plaintiff's child without probable cause or due process.

26.    RRPD Officer David Portis therefore interfered with the Plaintiff's parent/child relationship rights under the 14th Amendment, which in turn has caused Plaintiff a great amount of physical and emotional distress by the loss of those rights.  The effects of that physical and emotional distress are ongoing to this day.

27.    CYFD, by New Mexico law cannot seize a child, only law enforcement or medical personnel can.

28.    Defendant listed above acted willfully, knowingly, and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights.  As a result of the nature of

Defendant's conduct, Plaintiff is entitled to recover punitive damages against the individual Defendant.

### COUNT 4

Interference with Parent Child Relationship

14th Amendment

New Mexico Constitution Article 2 Sections 4, 14, & 18

Civil Rights Act (2021)

RRPD Standards and Procedures Manual

**Santosky v. Kramer, 455 U.S. 745, 102 S. Ct. 1388**

Defendant: Phillip Gallegos

**June 21, 2022**

**at La Petite Daycare Parking Lot (CAD# 22-004855)**

1.      Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

2.      Plaintiff called RRPD to the scene to assist him in a civil standby as he picked up his child on June 21, 2022 at about 4 pm per Plaintiff's New Mexico District Court Order.

3.      RRPD Officer Phillip Gallegos arrived on the scene about about 5:30 pm.

4.      Plaintiff immediately showed him the custody order and that he was there to pick up his child.

5.      About 5:40 pm Gallegos says to JR and caseworker,"***This is a court order and this is a safety plan.  Court orders trump safety plans.***"

6.      About 5:47 pm Plaintiff tells Gallegos,"***It's simple guys, a safety plan is not a court order.  You guys would be warring against the Constitution.***"  To which Gallegos replies," ***I know***".

7.      About 5:49 pm Gallegos says to Plaintiff,"***So they (JR and caseworker) are saying that he (minor child) will be sexually abused but I don't think there is any evidence.***"

8.      About 6:21 pm Plaintiff tells Gallegos,"***A safety plan does not supersede a district court***

order." To which Gallegos replies,"*I agree with that completely.*"

9.     About 6:22 pm Plaintiff tells Gallegos,"*He (minor child) is under no danger by me, I have never been accused of a crime in my life.*" To which Gallegos says,"*There is allegations though.*" Plaintiff replies,"*But that is not due process.*" Gallegos replies,"*I understand that, you are absolutely right.*"

10.     About 6:29 pm Plaintiff tells Gallegos, "*I'm a father. I have civil rights and you are trying to violate them for no reason with absolutely no cause...due process that's it.*"

11.     About 6:22 pm Plaintiff asks Gallegos,"*Do you have any proof that he (minor child) is in danger?*" To which Gallegos replies,"*I do not.*"

12.     About 6:55 pm Plaintiff instructs both Gallegos and Portis about what a safety plan is supposed to look like by showing them the CYFD Safety Assessment Manual.

13.     Gallegos tells Army and Portis that Plaintiff had allowed the Sandoval Sheriff's to do a walk through of his residence with the minor child present just 5 days before.

14.     About 7:59 pm Gallegos (while talking to RRPD Detective Supervisor Brittany Mahnesmith) says to Army and Portis,"*I'm not getting where the safety indicators are at, I just get the feeling CYFD just doesn't like him.*"

15.     About 8:03 pm Gallegos tells Army and Portis,"*Brittany (Mahnesmith) doesn't believe that CYFD has enough for a safety plan.*"

16.     About 8:04 pm Gallegos goes on to tell Army and Portis,"*Brittany (Mahnesmith) feels that the safety plan does not trump a district court order.*"

17.     About 8:04 pm Gallegos tells Army and Portis that Plaintiff said that the unsigned safety plan was forced upon Plaintiff under threat of physical harm just 5 days prior. To which Portis replied to him,"*That's not how safety plans work.*"

18.     About 8:07 pm Gallegos says to Army and Portis,"*Those guys (Bernalillo CYFD) do*

*whatever they want, they come in here and they bulldog these dads, and they are like give me your fucking kid and you're a piece of shit. Like they are harsh*."

19.    About 8:08 pm Army and Portis both say,"*Well the consensus now is that we don't see enough to enforce the safety plan*."  To which Army says,"*Let Dad have his custody*."

20.    About 8:09 pm Portis asks Gallegos,"*Because that (safety plan) is different than taking the child and putting him on a hold, right?*"  To which Gallegos replies,"*Right, because we would have reason for it*."

21.    About 8:12 pm Gallegos says, "*I really don't want to violate the court order because I just don't feel like the safety plan is enough*."

22.    About 8:12 pm Portis remarks to Gallegos and Army about the unsigned safety plan in his hand, "*This is terrible*."  To which Army agrees.

23.    Portis then asks JR,"*Has he (Plaintiff) ever threatened to take the child out of state before?*".  To which JR surprisingly admits,"*No*".  Gallegos and Army heard this which is further proof that Plaintiff was not a flight risk.

24.    About 8:47 Gallegos and Portis hear Army ask the caseworker *if she thinks the minor child will be harmed*. To which she replies,"*It's possible.  We don't know*."

25.    Gallegos and Portis hears Army say to the caseworker,"*So we don't necessarily think the child was going to be in any sort of physical danger or think that he's gonna flee to Texas or coach the child.*

26.    About 8:51 Gallegos, Portis, and Army all hear the caseworker say that she doesn't even know what day it is.

27.    About 8:53 pm Gallegos asks the caseworker,"*Do you think sexual abuse is going to occur within the next 4 days if Noble (minor child) goes with Jarrod?*"  To which the caseworker candidly replies,"*I don't know*."  Gallegos responds to that,"*Neither do we Right*?"

18

28.    Portis abruptly says to Gallegos and Army, "***The child is in danger.***" To which Gallegos replies, "***Yep***". Army adds another knowing lie,"***for sexual molestation and mental abuse in the next 4 days.***"

29.    Portis says to Gallegos and Army,"***and the child needs to remain***."

30.    About 8:58 pm Gallegos hears Plaintiff tell Portis,"***The Judge hasn't seen it (safety plan)."*** To which Portis replies,***"Correct.***"

31.    About 8:58 pm Gallegos also hears Plaintiff ask Portis,"***Is she (Judge Johnston) going to make an order of that?***". To which Portis replies,"***No.***"

32.    About 9 pm Gallegos hears Portis tell Plaintiff,"***I didn't have signed copy of the safety plan.***" To which Plaintiff replies,"***You still don't.***" Portis acknowledges that fact by saying,"***Correct***".

33.    About 9:00 pm Plaintiff tells Gallegos,"***You have just drove over this District Court Order.***" Gallegos Replies,"***With her permission. She (Judge Johnston) is saying that the safety plan supersedes her court order.***" Plaintiff replies,"***But this is not Court we are having here.***" To which Gallegos responds,"***I'm really trying to help you out.***"

34.    About 9:05 pm Gallegos hears Portis tell the daycare workers,"***This is a lose lose for everyone.***"

35.    RRPD Officer Phillip Gallegos, knowing that the safety plan was an unofficial document, knowing that it was given to Plaintiff under duress, knowing that a safety plan is a voluntary agreement that Plaintiff never agreed to, knowing that the Judge was not going to issue an order or a warrant, and knowing he and the other RRPD officers on scene saw no safety concerns, unreasonably seized Plaintiff's child without probable cause or due process.

36.    CYFD, by New Mexico law cannot seize a child, only law enforcement or medical personnel can.

37.    RRPD Officer Phillip Gallegos therefore interfered with the Plaintiff's parent/child

19

relationship rights under the 14th Amendment, which in turn has caused Plaintiff a great amount of physical and emotional distress by the loss of those rights.  The effects of that physical and emotional distress are ongoing to this day.

38.     Defendant listed above acted willfully, knowingly, and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights.  As a result of the nature of Defendant's conduct, Plaintiff is entitled to recover punitive damages against the individual Defendant.

### COUNT 5

Interference with Parent Child Relationship

14th Amendment

New Mexico Constitution Article 2 Sections 4, 14, & 18

Civil Rights Act (2021)

RRPD Standards and Procedures Manual

**Santosky v. Kramer, 455 U.S. 745, 102 S. Ct. 1388**

Defendant: N. Army

**June 21, 2022**

**at La Petite Daycare Parking Lot (CAD#22-004855)**

1.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

2.     Plaintiff called RRPD to do a civil standby while he picked up his child at La Petite daycare on Quantum Rd. Rio Rancho.

3.     RRPD Officer Phillip Gallegos called his supervisor, RRPD Officer David Portis, to the scene and then Portis called RRPD Officer N. Army to the scene. Army did not activate his own lapel video but can be seen clearly on the other officers videos as detailed previous and below.

4.     Army appears in the videos on the scene at about 7:15 pm or so.

5.     About 7:35 pm Army hears Gallegos say that Plaintiff never agreed to the safety plan.

20

6.     About 7:40 pm Gallegos tells Army that Plaintiff had allowed Sheriffs to do a walk through of his home with the minor child present just 5 days previous.

7.     About 8:03 pm Gallegos to Army and Portis,"***Brittany (Detective Mahnesmith) doesn't believe that CYFD has enough for a safety plan.***"

8.     About 8:04 pm Gallegos tells Army and Portis,"***Brittany feels that a safety plan does not trump a district court order.***"

9.     About 8:08 pm Army tells Portis and Gallegos,"***Well the consensus now is that we don't have enough...***".  To which Portis completes Army's sentence," ***to enforce the safety plan.***"

10.     About 8:12 pm Army and Gallegos hear Portis remark about the safety plan he is holding in his hand,"***This is terrible.***"

11.     About 8:17 pm Army hears JR admit that Plaintiff was not a flight risk.

12.     About 8:20 Army ask JR if plaintiff ever violated the court order.  She replies,"***No.***"

13.     About 8:43 pm Portis tells Army that he talked to Judge Johnston.  Army then asks"***But they (Judge Johnston) are putting all the liability on us doing it (seizing the child)....And who is going to be getting sued for that***?  Portis replies,"***Both (Judge and the RRPD Officers).***"

14.     About 8:45 pm Army admits to Portis, "***I don't know if the safety of the child is the concern more so it sounds like the interview, so it's not a safety concern...***"

15.     About 8:39 pm Army, Portis, and Gallegos hear JR admit that her boyfriend was using methamphetamines, just as Plaintiff told the officers and Detective Parker.

16.     About 8:47 pm Army asks the caseworker,"***Physical harm, like sexual molestation?***" To which the caseworker replies,"***It's possible.  We don't know.***"

17.     About 8:47 pm Army says,"***But in his defense he (Plaintiff) said it was under duress, which has been confirmed by both Sandoval County and mom.***"

18.     About 8:50 pm Army finally says,"***So we don't necessarily think the child was going to

21

*be in any sort of physical danger or think that he's gonna flee to Texas or coach the child.*"

19.     About 8:51 pm Army hears the caseworker say she doesn't know what day it is.

20.     About 8:53 pm Gallegos and Portis hear Army again ask the caseworker,"*Do you think sexual abuse is going to occur within the next 4 days if Noble goes with Jarrod*?" To which the caseworker replies,"*I don't know.*" Army follows up with,"*Neither do we, right*?

21.     About 8:55 pm Army and the other officers can be seen on video fabricating evidence.

22.     About 9:06 pm Portis tell Army,"*She (caseworker) believes the child is in danger because of facts that I am not getting other than the fact that he (Plaintiff) is who he is. No one is telling me the child is being abused.*"

23.     About 9:07 pm Portis tells Army,"*And he is gonna sue. The judge already told me on the phone like, well every person who was there is gonna get named in a lawsuit.*"

24.     About 9:08 pm Army hears Portis tell Gallegos,"*She (caseworker) wants us to put the child on a 48 hour hold. I don't think we have enough.*" Gallegos replies, "*No.*"

25.     About 9:10 pm Portis tells Army and Gallegos,"*Oh yeah. I mean it's all allegations...*" Gallegos follows,"*That's what I am going to put in my report*."

26.     The officers are all gathered here and are continuing to justify their actions and rehearsing their fabricated stories that Plaintiff child was somehow in danger.

27.     About 9:22 pm Army hears Portis coaching JR to hide the child,"*You are going to have to find the balance of him not having contact with the child and hiding the child from him.*"

28.     About 9:26 pm Army and Gallegos hear Portis say,"*Grab the child*."

29.     RRPD Officer N. Army, knowing that the safety plan was an unofficial document, knowing that it was given to Plaintiff under duress, knowing that the safety plan is a voluntary agreement that Plaintiff never agreed to, knowing that the Judge was not going to issue an order or a warrant, and knowing he and the other RRPD officers on scene saw no safety concerns, he

unreasonably seized Plaintiff's child without probable cause or due process.

30.     CYFD, by New Mexico law cannot seize a child, only law enforcement or medical personnel can.

31.     RRPD Officer N. Army therefore interfered with the Plaintiff's parent/child relationship rights under the 14th Amendment, which in turn has caused Plaintiff a great amount of physical and emotional distress by the loss those rights.  The effects of that physical and emotional distress are ongoing to this day.

32.     Defendant listed above acted willfully, knowingly, and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights.  As a result of the nature of Defendant's conduct, Plaintiff is entitled to recover punitive damages against the individual Defendant.

## COUNT 6

Unreasonable Seizure of Plaintiff's 1st Liberty Interest

4th Amendment

New Mexico Constitution Article 2 Sections 4, 10,14, & 18

Civil Rights Act (2021)

RRPD Standards and Procedures Manual

**Jones v. Hunt, 410 F.3d 1221, 10th Circuit of Appeals (2005)**

Defendant: David Portis

**June 21, 2022**

**at La Petite Daycare Parking Lot (CAD#22-004855)**

1.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

2.     David Portis is called by Phillip Gallegos to the scene of a civil standby in which Plaintiff has requested the RRPD to facilitate the pickup of his child per his New Mexico District court order.  Portis arrives on the scene at around 6:50 pm.

23

3.    Upon arrival on scene Plaintiff fully informs Portis of the court order and the unsigned safety plan and how it is a fraudulent document.  Portis can be seen on his own lapel camera videos stating that the safety plan is "**terrible**".

4.    After talking with Plaintiff and child's mother, further referred to as "JR", Portis can be seen on his lapel camera videos doubting the validity of the CYFD safety plan because it was unsigned.

5.    Portis can be viewed on his own videos doubting the truthfulness of the CYFD caseworker saying,"**She has not been helpful at all**".

6.    Portis can be viewed on his own videos doubting the truthfulness of the minor child's mother.

7.    Portis can be viewed on his own videos failing to inform Judge Johnston that the safety plan was given to plaintiff by threat of bodily harm and that it was unsigned by either parent.

8.    Portis can be seen on his own video saying to Plaintiff that the Judge was not going to issue an order to seize the child.

9.    Portis can be viewed on the video being told by Lead Detective Mahnesmith that there is no investigation currently into Plaintiff or his minor child.

10.    Portis can be viewed being told by Mahnesmith that she doesn't see how CYFD even got to a safety plan.

11.    Portis can be seen on his video being told by Army,"**So we don't necessarily think the child was going to be in any sort of physical danger or think he is gonna flee to Texas or coach the child**".

12.    Portis can be seen on the video lying to Plaintiff when questioned whether he told the Judge the safety plan wasn't signed and he says,"**Yep**".

13.    Portis can be viewed on his video hearing the caseworker say "**I don't know**" when questioned if she thinks the child will be harmed by Plaintiff.

24

14.     Portis can be viewed on his video hearing the caseworker tell him about the safety plan,"*from the beginning, excuse my language, but it's (safety plan) been fucked up*."

15.     Portis can be heard on his own video saying,"*She (caseworker) believes the child is in danger, but what I'm not seeing is enough for me to prove the child is in danger.  I'm not discrediting her (caseworker) but I'm just saying I don't have it (proof) in front of me.*"

16.     Portis can be viewed on his video saying,"*She (caseworker) believes the child is in danger based off facts that I am not getting...other that the fact that he (Plaintiff) is who he is.*"

17.     Portis can be seen on his own video facilitating the defrauding of a CYFD state document when he asks the caseworker if she has the ,"*correct dates and signatures and all that good stuff*".

18.     Portis can be seen on his own video fabricating evidence with the two other officers that they all of the sudden think the child is in danger.


19.     Portis can be seen on his own video saying he doesn't see enough evidence for a 48 hour hold, but seizes the child for 21 days.

20.     Portis can be seen on his own video disparaging Plaintiff in front of everyone, including his child's mother, on several different occasions.

21.     Portis can be seen on his video telling the child's mother,"*You are going to have to find the balance of him (Plaintiff) not contacting the child and hiding the child from him* ."

22.     Portis can be heard saying on his video that the Judge told him everyone on the scene is going to be named in a lawsuit, including the Judge for calling him.

23.     Portis can be seen on his own video saying,"*Let's grab the kid*".

24.     Plaintiff can be seen Portis' video on multiple occasions telling the officers that they are violating Plaintiff's Due Process rights.

25.    RRPD Officer Dave Portis, knowing that the safety plan was an unofficial document, knowing that it was given to Plaintiff under duress, knowing that a safety plan is a voluntary agreement that Plaintiff never agreed to, knowing that the Judge was not going to issue an order or warrant, and knowing that he and the other RRPD officers on scene saw no safety concerns, unreasonably seized Plaintiff's child without probable cause or due process.

25.    Portis can be seen on his video speaking with Judge Johnston.  Portis left out crucial exculpatory evidence.  Also, the judge detached from her role as a neutral magistrate and made knowingly false statements to him.   Portis violated Plaintiff's 4th Amendment by unlawfully seizing Plaintiff's 1st Liberty Interest, his child.

26.    CYFD, by New Mexico law cannot seize a child, only law enforcement or medical personnel can.

27.    Defendant listed above acted willfully, knowingly, and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights.  As a result of the nature of Defendant's conduct, Plaintiff is entitled to recover punitive damages against the individual Defendant.


### COUNT 7

Deliberate Fabrication of Evidence

14th Amendment

New Mexico Constitution Article 2 Sections 4, 14, & 18

Civil Rights Act (2021)

RRPD Standards and Procedures Manual

**Spencer vs. Peters, 857 F.3d 789, (9th Cir., 2017)**

Defendant: David Portis

June 21, 2022

at La Petite Daycare Parking Lot (**CAD# 22-004855**)

26

1.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

2.     David Portis is called by Phillip Gallegos to the scene of a civil standby in which Plaintiff has requested the RRPD to facilitate the pickup of his child per his New Mexico District court order.  Portis arrives on the scene at around 6:50 pm.

3.     Upon arrival on scene Plaintiff fully informs Portis of the court order and the unsigned safety plan and how it is a fraudulent document.  Portis can be seen on his own lapel camera videos stating that the safety plan is *"terrible"*.

4.     After talking with Plaintiff and child's mother, further referred to as "JR", Portis can be seen on his lapel camera videos doubting the CYFD unsigned safety plan because it was unsigned.

5.     Portis can be viewed on his own videos doubting the truthfulness of the CYFD caseworker  saying,*"She has not been helpful at all"*.

6.     Portis can be viewed on his own videos doubting the truthfulness of the minor child's mother.

7.     Portis can be viewed on his own videos failing to inform Judge Johnston that the safety plan was given to plaintiff by threat of bodily harm and that it was unsigned by either parent.

8.     Portis can be seen on his own video saying to Plaintiff that the Judge was not going to issue an order to seize the child.

9.     Portis can be viewed on the video being told by Lead Detective Mahnesmith that there is no investigation currently into Plaintiff or his minor child.

10.     Portis can be viewed being told by Mahnesmith that she doesn't see how CYFD even got to a safety plan.

11.     Portis can be seen on his video being told by Army,*"So we don't necessarily think the child was going to be in any sort of physical danger or think he is gonna flee to Texas or coach the child"*.

12.    Portis can be seen on the video lying to Plaintiff when questioned whether he told the Judge the safety plan wasn't signed and he says,"*Yep*".

13.    Portis can be viewed on his video hearing the caseworker say "*I don't know*" when questioned if she thinks the child will be harmed by Plaintiff.

14.    Portis can be viewed on his video hearing the caseworker tell him about the safety plan,"*from the beginning, excuse my language, but it's (safety plan) been fucked up*."

15.    Portis can be heard on his own video saying,"*She (caseworker) believes the child is in danger, but what I'm not seeing is enough for me to prove the child is in danger.  I'm not discrediting her (caseworker) but I'm just saying I don't have it (proof) in front of me*."

16.    Portis can be viewed on his video saying,"*She (caseworker) believes the child is in danger based off facts that I am not getting...other that the fact that he (Plaintiff) is who he is*."

17.    Portis can be seen on his own video facilitating the defrauding of a CYFD state document when he asks the caseworker if she has the ,"*correct dates and signatures and all that good stuff*".

18.    Portis can be seen on his own video fabricating evidence with the two other officers that they all of the sudden think the child is in danger.

19.    Portis can be seen on his own video saying he doesn't see enough evidence for a 48 hour hold, but seizes the child for 21 days.

20.    Portis can be seen on his own video disparaging Plaintiff in front of everyone, including his child's mother, on several different occasions.

21.    Portis can be seen on his video telling the child's mother,"*You are going to have to find the balance of him (Plaintiff) not contacting the child and hiding the child from him .*"

22.    Portis can be heard saying on his video that the Judge told him everyone on the scene is

28

going to be named in a lawsuit, including the Judge for calling him.

23.    Portis can be seen on his own video saying,"***Let's grab the kid***".

24.    Plaintiff can be seen Portis' video on multiple occasions telling the officers that they are violating Plaintiff's Due Process rights.

25.    RRPD Officer Dave Portis, knowing that the safety plan was an unofficial document, knowing that it was given to Plaintiff under duress, knowing that a safety plan is a voluntary agreement that Plaintiff never agreed to, knowing that the Judge was not going to issue an order or warrant, and knowing that he and the other RRPD officers on scene saw no safety concerns, unreasonably seized Plaintiff's child without probable cause or due process.

26.    Portis can be seen on his video speaking with Judge Johnston.  Portis left out crucial exculpatory evidence.  Also, the judge detached from her role as a neutral magistrate and made knowingly false statements to him.

27.    RRPD Officer David Portis therefore deprived Plaintiff's rights under the 14th Amendment by fabricating evidence against him, which in turn has caused Plaintiff a great amount of physical and emotional distress by the loss of those rights.  The effects of that physical and emotional distress are ongoing to this day.

28.    CYFD, by New Mexico law cannot seize a child, only law enforcement or medical personnel can.

28.    Defendant listed above acted willfully, knowingly, and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights.  As a result of the nature of Defendant's conduct, Plaintiff is entitled to recover punitive damages against the individual Defendant.

## COUNT 8

Deliberate Fabrication of Evidence

14th Amendment

New Mexico Constitution Article 2 Sections 4, 14, & 18

Civil Rights Act (2021)

RRPD Standards and Procedures Manual

**Spencer vs. Peters, 857 F.3d 789, (9th Cir., 2017)**

Defendant: Phillip Gallegos

June 21, 2022

at La Petite Daycare Parking Lot (**CAD# 22-004855**)


1.      Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

2.      Plaintiff called RRPD to the scene to assist him in a civil standby as he picked up his child on June 21, 2022 at about 4 pm per Plaintiff's New Mexico District Court Order.

3.      RRPD Officer Phillip Gallegos arrived on the scene about about 5:30 pm.

4.      Plaintiff immediately showed him the custody order and that he was there to pick up his child.

5.      About 5:40 pm Gallegos says to JR and caseworker,"*This is a court order and this is a safety plan.  Court orders trump safety plans*."

6.      About 5:47 pm Plaintiff tells Gallegos,"*It's simple guys, a safety plan is not a court order.  You guys would be warring against the Constitution.*"  To which Gallegos replies," *I know*".

7.      About 5:49 pm Gallegos says to Plaintiff,"*So they (JR and caseworker) are saying that he (minor child) will be sexually abused but I don't think there is any evidence.*"

8.      About 6:21 pm Plaintiff tells Gallegos,"*A safety plan does not supersede a district court order*."  To which Gallegos replies,"*I agree with that completely*."

9.      About 6:22 pm Plaintiff tells Gallegos,"*He (minor child) is under no danger by me, I have never been accused of a crime in my life*."  To which Gallegos says,"*There is allegations though*."  Plaintiff replies,"*But that is not due process*."  Gallegos replies,"*I understand that, you are*

*absolutely right.*"

10.    About 6:29 pm Plaintiff tells Gallegos, "*I'm a father. I have civil rights and you are trying to violate them for no reason with absolutely no cause...due process that's it.*"

11.    About 6:22 pm Plaintiff asks Gallegos,"*Do you have any proof that he (minor child) is in danger?*" To which Gallegos replies,"*I do not.*"

12.    About 6:55 pm Plaintiff instructs both Gallegos and Portis about what a safety plan is supposed to look like by showing them the CYFD Safety Assessment Manual.

13.    Gallegos tells Army and Portis that Plaintiff had allowed the Sandoval Sheriff's to do a walk through of his residence with the minor child present just 5 days before.

14.    About 7:59 pm Gallegos (while talking to RRPD Detective Supervisor Brittany Mahnesmith) says to Army and Portis,"*I'm not getting where the safety indicators are at, I just get the feeling CYFD just doesn't like him.*"

15.    About 8:03 pm Gallegos tells Army and Portis,"*Brittany (Mahnesmith) doesn't believe that CYFD has enough for a safety plan.*"

16.    About 8:04 pm Gallegos goes on to tell Army and Portis,"*Brittany (Mahnesmith) feels that the safety plan does not trump a district court order.*"

17.    About 8:04 pm Gallegos tells Army and Portis that Plaintiff said that the unsigned safety plan was forced upon Plaintiff under threat of physical harm just 5 days prior. To which Portis replied to him,"*That's not how safety plans work.*"

18.    About 8:07 pm Gallegos says to Army and Portis,"*Those guys (Bernalillo CYFD) do whatever they want, they come in here and they bulldog these dads, and they are like give me your fucking kid and you're a piece of shit. Like they are harsh.*"

19.    About 8:08 pm Army and Portis both say,"*Well the consensus now is that we don't see enough to enforce the safety plan.*" To which Army says,"*Let Dad have his custody.*"

20.     About 8:09 pm Portis asks Gallegos,"*Because that (safety plan) is different than taking the child and putting him on a hold, right?*" To which Gallegos replies,"*Right, because we would have reason for it.*"

21.     About 8:12 pm Gallegos says, "*I really don't want to violate the court order because I just don't feel like the safety plan is enough.*"

22.     About 8:12 pm Portis remarks to Gallegos and Army about the unsigned safety plan in his hand, "*This is terrible.*" To which Army agrees.

23.     Portis then asks JR,"*Has he (Plaintiff) ever threatened to take the child out of state before?*". To which JR surprisingly admits,"*No*". Gallegos and Army heard this which is further proof that Plaintiff was not a flight risk.

24.     About 8:47 Gallegos and Portis hear Army ask the caseworker *if she thinks the minor child will be harmed*. To which she replies,"*It's possible. We don't know.*"

25.     Gallegos and Portis hears Army say to the caseworker,"*So we don't necessarily think the child was going to be in any sort of physical danger or think that he's gonna flee to Texas or coach the child.*

26.     About 8:51 Gallegos, Portis, and Army all hear the caseworker say that she doesn't even know what day it is.

27.     About 8:53 pm Gallegos asks the caseworker,"*Do you think sexual abuse is going to occur within the next 4 days if Noble (minor child) goes with Jarrod?*" To which the caseworker candidly replies,"*I don't know.*" Gallegos responds to that,"*Neither do we Right*?"

28.     Portis abruptly says to Gallegos and Army, "*The child is in danger.*" To which Gallegos replies, "*Yep*". Army adds another knowing lie,"*for sexual molestation and mental abuse in the next 4 days.*"

29.     Portis says to Gallegos and Army,"*and the child needs to remain.*"

30.     About 8:58 pm Gallegos hears Plaintiff tell Portis,"***The Judge hasn't seen it (safety plan)."*** To which Portis replies*,"Correct."*

31.     About 8:58 pm Gallegos also hears Plaintiff ask Portis,"***Is she (Judge Johnston) going to make an order of that?***". To which Portis replies,"***No.***"

32.     About 9 pm Gallegos hears Portis tell Plaintiff,"***I didn't have signed copy of the safety plan.***" To which Plaintiff replies,"***You still don't.***" Portis acknowledges that fact by saying,"***Correct***".

33.     About 9:00 pm Plaintiff tells Gallegos,"***You have just drove over this District Court Order.***" Gallegos Replies,"***With her permission. She (Judge Johnston) is saying that the safety plan supersedes her court order.***" Plaintiff replies,"***But this is not Court we are having here.***" To which Gallegos responds,"***I'm really trying to help you out.***"

34.     About 9:05 pm Gallegos hears Portis tell the daycare workers,"***This is a lose lose for everyone.***"

35.     RRPD Officer Phillip Gallegos, knowing that the safety plan was an unofficial document, knowing that it was given to Plaintiff under duress, knowing that a safety plan is a voluntary agreement that Plaintiff never agreed to, knowing that the Judge was not going to issue an order or a warrant, and knowing he and the other RRPD officers on scene saw no safety concerns, unreasonably seized Plaintiff's child without probable cause or due process.

36.     CYFD, by New Mexico law cannot seize a child, only law enforcement or medical personnel can.

37.     RRPD Officer Phillip Gallegos therefore violated Plaintiff's right to be free from the fabrication of evidence under the 14th Amendment, which in turn has caused Plaintiff a great amount of physical and emotional distress by the loss of those rights. The effects of that physical and emotional distress are ongoing to this day.

38.     Defendant listed above acted willfully, knowingly, and purposefully and/or with

deliberate indifference to deprive Plaintiff of his Constitutional Rights. As a result of the nature of

Defendant's conduct, Plaintiff is entitled to recover punitive damages against the individual Defendant.

## COUNT 9

Deliberate Fabrication of Evidence

14th Amendment

New Mexico Constitution Article 2 Sections 4, 14, & 18

Civil Rights Act (2021)

RRPD Standards and Procedures Manual

**Spencer vs. Peters, 857 F.3d 789, (9th Cir., 2017)**

Defendant: N. Army

June 21, 2022

at La Petite Daycare Parking Lot (**CAD# 22-004855**)

1.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

2.    Plaintiff called RRPD to do a civil standby while he picked up his child at La Petite

daycare on Quantum Rd. Rio Rancho.

3.    RRPD Officer Phillip Gallegos called his supervisor, RRPD Officer David Portis, to the

scene and then Portis called RRPD Officer N. Army to the scene. Army did not activate his own lapel

video but can be seen clearly on the other officers videos as detailed previous and below.

4.    Army appears in the videos on the scene at about 7:15 pm or so.

5.    About 7:35 pm Army hears Gallegos say that Plaintiff never agreed to the safety plan.

6.    About 7:40 pm Gallegos tells Army that Plaintiff had allowed Sheriffs to do a walk

through of his home with the minor child present just 5 days previous.

7.    About 8:03 pm Gallegos to Army and Portis,"***Brittany (Detective Mahnesmith) doesn't***

***believe that CYFD has enough for a safety plan.***"

8.      About 8:04 pm Gallegos tells Army and Portis,"*Brittany feels that a safety plan does not trump a district court order.*"

9.      About 8:08 pm Army tells Portis and Gallegos,"*Well the consensus now is that we don't have enough...*".  To which Portis completes Army's sentence," *to enforce the safety plan*."

10.     About 8:12 pm Army and Gallegos hear Portis remark about the safety plan he is holding in his hand,"*This is terrible*."

11.     About 8:17 pm Army hears JR admit that Plaintiff was not a flight risk.

12.     About 8:20 Army ask JR if plaintiff ever violated the court order.  She replies,"*No*."

13.     About 8:43 pm Portis tells Army that he talked to Judge Johnston.  Army then asks"*But they (Judge Johnston) are putting all the liability on us doing it (seizing the child)....And who is going to be getting sued for that*? Portis replies,"*Both (Judge and the RRPD Officers)*."

14.     About 8:45 pm Army admits to Portis, "*I don't know if the safety of the child is the concern more so it sounds like the interview, so it's not a safety concern...*"

15.     About 8:39 pm Army, Portis, and Gallegos hear JR admit that her boyfriend was using methamphetamines, just as Plaintiff told the officers and Detective Parker.

16.     About 8:47 pm Army asks the caseworker,"*Physical harm, like sexual molestation?*" To which the caseworker replies,"*It's possible.  We don't know.*"

17.     About 8:47 pm Army says,"*But in his defense he (Plaintiff) said it was under duress, which has been confirmed by both Sandoval County and mom*."

18.     About 8:50 pm Army finally says,"*So we don't necessarily think the child was going to be in any sort of physical danger or think that he's gonna flee to Texas or coach the child*."

19.     About 8:51 pm Army hears the caseworker say she doesn't know what day it is.

20.     About 8:53 pm Gallegos and Portis hear Army again ask the caseworker,"*Do you think sexual abuse is going to occur within the next 4 days if Noble goes with Jarrod*?" To which the

caseworker replies,"*I don't know.*"  Army follows up with,"*Neither do we, right*?

21.     About 8:55 pm Army and the other officers can be seen on video fabricating evidence.

22.     About 9:06 pm Portis tell Army,"*She (caseworker) believes the child is in danger because of facts that I am not getting other than the fact that he (Plaintiff) is who he is.  No one is telling me the child is being abused.*"

23.     About 9:07 pm Portis tells Army,"*And he is gonna sue.  The judge already told me on the phone like, well every person who was there is gonna get named in a lawsuit.*"

24.     About 9:08 pm Army hears Portis tell Gallegos,"*She (caseworker) wants us to put the child on a 48 hour hold.  I don't think we have enough.*"  Gallegos replies, "*No.*"

25.     About 9:10 pm Portis tells Army and Gallegos,"*Oh yeah.  I mean it's all allegations...*"  Gallegos follows,"*That's what I am going to put in my report.*"

26.     The officers are all gathered here and are continuing to justify their actions and rehearsing their fabricated stories that Plaintiff child was somehow in danger.

27.     About 9:22 pm Army hears Portis coaching JR to hide the child,"*You are going to have to find the balance of him not having contact with the child and hiding the child from him.*"

28.     About 9:26 pm Army and Gallegos hear Portis say,"*Grab the child.*"

29.     RRPD Officer N. Army, knowing that the safety plan was an unofficial document, knowing that it was given to Plaintiff under duress, knowing that the safety plan is a voluntary agreement that Plaintiff never agreed to, knowing that the Judge was not going to issue an order or a warrant, and knowing he and the other RRPD officers on scene saw no safety concerns, he unreasonably seized Plaintiff's child without probable cause or due process.

30.     CYFD, by New Mexico law cannot seize a child, only law enforcement or medical personnel can.

31.     RRPD Officer N. Army therefore deprived Plaintiff  rights under the 14th Amendment by

36

fabricating evidence against him, which in turn has caused Plaintiff a great amount of physical and emotional distress by the loss those rights. The effects of that physical and emotional distress are ongoing to this day.

32.     Defendant listed above acted willfully, knowingly, and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights. As a result of the nature of Defendant's conduct, Plaintiff is entitled to recover punitive damages against the individual Defendant.

## COUNT 10

Unequal Treatment Under The Law

14th Amendment

New Mexico Constitution Article 2 Sections 4, 10,14, & 18

Civil Rights Act (2021)

RRPD Standards and Procedures Manual

**A.N. V. Syling, 928 F.3d 1191 (10th Circuit, 2019)**

Defendant: Ben Parker

**May 5, 2022**

Case # 22003470 and Case # 22-004875

1.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

2.     Plaintiff was forced to file a report on his child's mother, further referred to as JR, on May 5, 2022 about 10 am. RRPD Officer Chris Smith wrote that report.

3.     Plaintiff told Smith his fears that his child was being exposed to methamphetamine use in his mother's home, among other concerns. Per 30-6-1 (J) of the New Mexico Criminal Statute,"*Evidence that demonstrates that a child has been knowingly and intentionally exposed to the use of methamphetamine shall be deemed prima facie evidence of abuse of the child.*"

4.     Under the New Mexico Children's Code 32A-4-3 (2019) it is crime to fail to report child abuse to law enforcement.

5.     On May 10th, 2022 RRPD Sergeant P. Rogahn of the Violent Crimes Unit (VCU) thought

Plaintiff's well supported allegations were serious enough to warrant an investigation. Sergeant Rogahn assigned the case to Detective Ben Parker. The following statements by Plaintiff are taken from Parker's own reports and body cam videos.

6.     The matters to be investigated were that Plaintiff's child was being exposed to meth use in his mother's home, that the mother was brainwashing the child to call her meth addict boyfriend by a false name, and that the mother was allowing the minor child's 13 year old sister to smoke marijuana and drink alcohol to the point that she was passing out on the floor.

7.     Plaintiff provided self authenticating New Mexico state documents which proved all of the claims, including the mother's own 911 call to the RRPD just 6 months prior where she told them her daughter was smoking marijuana, vape pens, stealing, running away, and had a drug dealer coming by the house to sell her daughter drugs **(CAD#21-150720)**.

8.     In his investigation Parker showed a clear bias against charging Plaintiff's child's mother despite actually verifying all of the allegations and facts in Plaintiff's report.

9.     It was only after the mother was being questioned about the prevalence of drug use in her home, that she and her father made "***similar statements***" that Plaintiff had been inappropriate with her daughter 6-7 years ago but said the child would deny it if asked.

10.     Because of these unfounded allegations, Parker abandoned his assigned mission into the mother's child abuse and instead solely focused on the false allegation that Plaintiff had somehow touched a 6 year old girl inappropriately.

11.     In doing so Parker violated RRPD Procedures Manual for investigation protocol. Parker should have handed the mothers allegation off to a different detective if he thought it was serious enough. Instead, he overlooked mother's exposure of her children to meth use, marijuana, and alcohol use in her home.

12.     Parker also overlooked the mother's admission to the brainwashing of our 6 year old

child but then accused Plaintiff of coaching the child without any proof or evidence to support it.

13.    At some point Parker pulled Detective John Christopher Miles on the case, but should have known it was Miles who was on the scene when the mother called RRPD due to the her daughter's drug fueled meltdown 6 months earlier. Officer Miles failed to investigate who was dealing drugs to the child. This further conflict of interest went unreported in Parker's report and subsequent Miles report.

14.    Parker's investigation was complicated by the fact he went out with COVID for weeks.

15.    Parker even lied multiple times in his report about making a referral to CYFD.

16.    Parker erred by conflating two investigations into one and the chaos that ensued led to Plaintiff's child being seized without warrant or order as his investigation left everyone in the dark.

17.    Plaintiff was never notified that Parker was investigating him for the false allegations of touching a child inappropriately. Although it is now clear he was lying telling everyone Plaintiff knew.

18.    Ultimately, Parker's report was found to have been not written contemporaneously, which violates RRPD Procedures manual. Plaintiff has video of Lead Detective Brittany Mahnesmith telling Sheriffs and police officers on June 16ᵗʰ and June 21, 2022 that she was looking at his report and it had nothing in it about Plaintiff being investigated.

19.    Parker was out on COVID during the seizure of Plaintiff's child by RRPD on June 21, 2022. When he caught wind of what confusion he had caused, Parker then retroactively went back and doctored his report on the day after the seizure on June 22, 2022.

20.    Parker's investigation was not legal by RRPD standards, and Plaintiff knows this because he has provided the Court with video when his supervisor, Mahnesmith realized that he had conflated two investigations into one and allowed CYFD unauthorized access into his investigation.

21.    CYFD used that unauthorized access, unlawfully given to them while Parker, who was out for multiple weeks to gain information from a safe house interview of JR's daughter they should have never been a part of. Given free reign they usurped the investigation from RRPD and committed

a fraud to retaliate against Plaintiff by opening an unauthorized investigation against Plaintiff. CYFD then used it as a pretense to seize his child on the June 16 by gunpoint and then on June 21 they intimidated RRPD, by use of a fraudulent and unsigned safety plan.

22.    This is why Parker doctored his report to deny ever referring CYFD into his investigation, because he and his supervisors are aware they illegally seized Plaintiff's child by fraud by use of a unauthorized CYFD safety plan.

23.    Parker is now denying getting CYFD involved in his investigation. This also explains why CYFD never filed a petition with the Children's Court because their involvement into Parker's investigation was unauthorized.

24.    Parker's report now had two separate heads, which is why RRPD has strict protocols against their detectives opening up never ending investigations of their own choosing. Parker's errors show a major malfunction in RRPD chain of command.

25.    The safe house interview for Plaintiff's son was conducted six days after Plaintiff's child was unlawfully seized, and during the interview the child spoke very highly of his father. The interviewer concluded that it was highly likely the boy was coached for the interview by his mom.

26.    Parker again overlooked this fact in his report and glossed over it with a biased pen.

27.    Plaintiff's minor child's 18 year old brother was also interviewed, and he said he never saw anything unusual when Plaintiff lived in his house 6-7 years go.

28.    After these interviews, Parker closed the case into the allegations against Plaintiff, saying it was "*unsubstantiated*".

29.    However, after he and Detective Mahnesmith found out that RRPD officers had unlawfully seized Plaintiff's child, in large part due to Parker's conflated case and CYFD's unauthorized access to the safe house interviews, RRPD initiated a cover up of the highest proportions.

30.    After being cleared of any wrongdoing, Plaintiff's child was returned to him without any

apology or acknowledgment by Parker, the RRPD, or CYFD.

31.    This whole time Plaintiff had been desperately trying to contact Parker by calling and going to the RRPD station but was denied every time.

32.    Mahnesmith and Parker then hatched a plan to cover up for Parker's mistake of conflating two separate investigations into one, so they opened up another unauthorized investigation to further try to frame Plaintiff even though Parker had already unsubstantiated his first case.

33.    Not by accident, Parker called in a call to himself the day after the illegal seizure of Plaintiff's child to avoid RRPD liability if this lawsuit was to ever be filed.

34.    Plaintiff has the report Parker filed on June 22, 2022 where he self generated a case # and investigation without any supervisor authorization to do so.  This act again is against RRPD Procedure protocols.

35.    The initial report written on the second case was obviously written in a hurry with many typos, errors, wrong dates, and contradicting statements to his first report.  The reason for the errors was that Parker was expecting his child to be born that day and was still out on paternity leave.

36.    Parker generated the second case # himself, wrote the initial report, and signed himself out of the case all at the same exact same time of 2:36 pm.  All of this only took one minute.  Plaintiff knows this by reviewing the activity logs which Parker never imagined Plaintiff would obtain because it was filed as confidential.

37.    After signing out of the case, he then assigns his partner Detective Miles to the case, even though he doesn't have authority to do so.

38.    The second case was a fraudulent case #, cooked up to cover up Parker's liability for the seizure of Plaintiff's child, as the facts show in the reports.

39.    In his report, Miles did nothing more that do a poor job copying Parker's first report and since it was written weeks after the fact and not contemporaneously, it is very flawed and has lots of

false statement and obvious typos.

40.    The second case # was a concerted rouse to to make some false allegations by a troubled teenager into a nefarious scheme perpetrated by a dangerous deviant criminal. The first and second report are full of known lies and fabricated evidences easily disproved by facts. But these reports were clearly written thinking that Plaintiff would never see them.

41.    The City of Rio Rancho did their best to stonewall Plaintiff for 6 months from releasing these documents denying multiple FOIA and IPRA requests. It was only when Plaintiff threatened to sue the City when the documents were suddenly able to be released.

42.    Detective Parker showed immense bias by refusing to charge the child's mother with a crime despite confirming every fact and document in Officer Smith's report. Parker instead maliciously prosecuted Plaintiff to cover up his own incompetence by filing a second fraudulent case #, which as caused much physical and emotional distress to Plaintiff which is ongoing.

43     Defendant listed above acted willfully, knowingly, and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights. As a result of the nature of Defendant's conduct, Plaintiff is entitled to recover punitive damages against the individual Defendant.

**COUNT 11**

Unequal Treatment Under The Law

14th Amendment

New Mexico Constitution Article 2 Sections 4, 10,14, & 18

Civil Rights Act (2021)

RRPD Standards and Procedures Manual

**A.N. V. Syling, 928 F.3d 1191 (10th Circuit, 2019)**

Defendant: John Christopher Miles

**May 5, 2022**

**Case # 22003470 and Case # 22-004875**

42

**(CAD #21-150720)**

1.      Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

2.      RRPD Detective John Christopher Miles became involved in Plaintiff's case on October 21, 2021 when he was dispatched to assist RRPD Officer Roman Lujan on a 911 call.  Plaintiff's child's mother, JR, told the officers that her child was smoking marijuana, vape pens, stealing, trying to run away, and that there was a drug dealer coming to her house to deal drugs to her 13 year old child.

2.      Lujan and Miles arrive on scene and in less than 30 minutes at 5:09 pm they sign out of the call with the following report,"*neg. on crimes, juvenile is having behavioral issues and not following mothers house rules, child agreed to calm down for the night and stop arguing with mother and grandfather.  neg crimes*."

3.      This report is not at all matching the serious allegations made to RRPD by the mother, JR.  Plaintiff's own child was there to witness this tragic event and was traumatized by it to this day.

4.      Under New Mexico Criminal Code 30-31-21 it is a third degree felony for any person to "*distribute a controlled substance (marijuana) to a person under the age of eighteen years*."

5.      In the mother's own words, she told John Christopher Miles that felony drug dealing was taking place at her house but Detective Miles never does any investigation into the matter.

6.      This is yet another example of the RRPD unequal treatment under the law.  Miles' dereliction into investigating a felony which directly placed the children in JR's home in danger , and made the whole City of Rio Rancho less safe.  Miles has one job; to investigate crimes and when he chooses not to do so, for preferential treatment, it undermines the rule of law in New Mexico.

7.      Nor did Miles write any report about the drug dealing to a 13 year old child.  Once again we have an RRPD officer sweeping a felony under the rug to protect the mother, JR.

8.      7 months later, Miles was brought into Detective Parker's investigation into the false allegations made by the mother and her daughter regarding inappropriate contact.

43

9.      However, Parker totally omits the fact that that Miles was on the call detailed with the same mother and her daughter just 6 months before.  Miles also omits that fact from his subsequent report as well.  That information would be most crucial in their investigations.

10.     Plaintiff was very critical of RRPD on May 17, 2022 in his initial interview with Parker about his departments handling of the lack of investigation into who was selling the 13 year old child drugs as Plaintiff rightly was concerned that the lack of investigation put his own child in harms way.

11.     Plaintiff, however, was unaware that he was actually criticizing Parker's partner, Detective Miles.  This in turn provided the motive as to why Parker, after his call with Plaintiff, became very biased in his investigation into the mothers child abuse, and instantly turned it around on Plaintiff trying to charge him with child abuse from a mere unfounded allegation 7 years earlier.

12.     Parker became biased because he knew, or should have known, that his co-Detective was legally compromised and he could be implicated personally.  This also explains why Parker and Miles then closed Parker's first case and, without authorization, opened up a hasty second case to eliminate the potentiality of any later allegations of investigational misconduct.

13.     Miles and Parker were well aware that Plaintiff had also made multiple visits to the RRPD police station to voice his concern as to why they were not investigating a felony drug deal to a 13 year old child in the same house his own child lives in.

14.     This provided motive for Miles' to open a malicious prosecution against against Plaintiff, which is evidenced by his inaccurate reports.

15.     Miles is listed as a detective on Parker's first report, and therefore he also allowed CYFD to have unauthorized access to the RRPD investigation.  CYFD had no authority to be involved in Parker and Miles' investigation because they had no intake case number to do so.

16.     Miles' allowed CYFD to usurp his investigation at his direction as the other detective, Parker, was out the whole time with COVID and paternity leave.

17.    The evidence points that Miles conspired with CYFD to illegally seize Plaintiff's child by gunpoint without any warrant, petition, or court order on June 16 and on June 21.

18.    Miles shared private details with CYFD caseworkers that should have been confidential.

19.    This fact is proven because Plaintiff has provided the Court with videos from June 16 and 21 where Detective Brittany Mahnesmith is reading Parker's report and they had no mention of any safety concern between Plaintiff and his child.  CYFD could have not gotten that confidential from any source other than Detective Miles.

20.    By the date of June 21, 2022 Detective Miles had never reached out to Plaintiff for an interview other than calling him once from an unknown number, which Plaintiff's phone doesn't accept.

21.    Despite not ever interviewing Plaintiff, the evidence points that Miles was engaged in a conspiracy to seize Plaintiff's child and engage in a malicious criminal prosecution as well.

22.    The day after RRPD unlawfully seized Plaintiff's child, Mahnesmith, Parker, and Miles concocted a scheme to alleviate their obvious liability by opening up another case # to try and legitimize their sloppy investigation into Plaintiff.

23.    On June 22, 2022 Parker self generated a case #, wrote the initial report, assigned Miles to that case, and signed himself out of that case all in about one minute at 2:36 pm.

24.    The next task they needed to do was for Miles to copy all Parker's first report onto the new case #.  Obviously, what Miles wrote in the second case was not written contemporaneously, as the RRPD Manual instructs their officers to do so.  Also in the RRPD Manual  it does not say that a Detective can generate his own case # to open an investigation and then assign it to another detective.

25.    Parker's opening of the second case # against Plaintiff, and the following report by Miles was a fraud, purposely committed by three RRPD Detectives who were trying to relieve their own liability from the lawsuit they knew was coming by Plaintiff for the illegal seizure of his child.

26.    Parker's first report remained open for another six days after he opened the second case #

. The first case # was closed on the June 29, 2022 and his supervisor Peter Roghan signed off to close the case on July 2, 2022. Meanwhile, the second case was opened on June 22, 2022 and signed off by Miles and Mahnesmith on July 14, 2022.

27.    Miles report is strangely enough not a word for word recount but is Mile's obvious attempts to take Parker's report and make it sound even more nefarious and damning against Plaintiff.

28.    Miles' report featured no new investigation at all. Mile's adds nothing new to Parker's first investigation. Most importantly, Miles' never even tries to set up an interview with the very person he is supposedly investigating for criminal sexual contact with a minor, which is the Plaintiff. Miles' begins and closes his investigation in the span of 19 days in which he never interviews Plaintiff at all.

29.    However, Miles knowingly lies in his report,*"On July 5 and July 7, 2022 I attempted to contact Jarrod. I was unsuccessful in making any contact with Jarrod and he does not allow messages on his phone. Det. Parker told me that he had been unsuccessful contacting Jarrod at the end of his investigation..."*

30.    Plaintiff has submitted to the Court an exhibit showing Plaintiff emailed Parker on June 17, 2022 and made calls to Parker while he was out on COVID. Parker never tried contacting Plaintiff.

32.    Miles concludes his strange report by admitting that JR's daughter, who supposedly made the allegations, was not even willing to cooperate with his investigation,*"Should (JR's daughter) ever to decide to cooperate with Law Enforcement and make a statement or further pertinent information is learned....This case should be considered closed..."*

33.    Miles filed a malicious criminal case against Plaintiff knowing it was unsupported by evidence. He and Parker omitted evidence from their reports to absolve JR of any criminal charges.

34.    On June 21, 2022 Plaintiff has provided the court with an audio cd of his trip to RRPD front desk and made contact with Officer Chris Smith. Plaintiff is again trying to contact Parker.

35.    Plaintiff never hears back from Parker and on July 19, 2022 at about 2:30 pm Plaintiff

demands a meeting with Parker at the RRPD police station. After waiting for some time, Parker finally

appears and gives Plaintiff permission to take his phone back with him into an interrogation room.

36.     Plaintiff has provided Court the Miles' body cam video of the following interview with

Parker and Miles.

37.     The date of the interview with Parker and Miles was 17 days after the close of the first

report and 5 days after Miles closed his second report. Plaintiff had never once met either officer.

38.     Plaintiff asks Parker how CYFD got involved, he lies and said he thought Plaintiff did.

39.     Parker admits on video to never having reviewed the case of false reports against JR.

40.     At 2:58 pm on his own video, Plaintiff again brings up that RRPD had failed to

investigate the felony drug deal involving the drug deal, Miles can be heard on his video saying that a

13 year old smoking marijuana is a *"civil matter"*.

41.     At 3:03 Plaintiff can be seen on video telling Parker and Miles that JR filed a naked

picture of him which is a crime in New Mexico under statute 30-37A-1. The do nothing about it.

42.     About 3:06 pm on his own video Miles says to Plaintiff,*"So we are not here for civil

matter we are here for criminal. That civil stuff is not the police department's job*." On November

23, 2022 Miles about 10:38 am Miles and a RRPD CVAU officer can be seen both giving JR civil legal

advice. Miles about 10:43 am says to JR,*"The Judge could end up revoking his (Plaintiff) rights*."

43.     About 10:44 November 23, 2022 JR can be seen on Miles' lapel video asking the CVAU

officer,*"Would you be willing to meet with my lawyer?"* To which she replies,*"Sure, definitely."*

44.   Plaintiff has given the court multiple forms of evidence showing Miles' obvious bias in his case

which was undertaken to maliciously prosecute Plaintiff knowing the is no evidence against him. Miles'

actions have cause Plaintiff much physical and emotional harm and is ongoing to this day.

45.     Defendant listed above acted willfully, knowingly, and purposefully and/or with

deliberate indifference to deprive Plaintiff of his Constitutional Rights. As a result of the nature of

Defendant's conduct, Plaintiff is entitled to recover punitive damages against the individual Defendant.

### COUNT 12

Malicious Prosecution

4th Amendment

New Mexico Constitution Article 2 Sections 4, 10,14, & 18

Civil Rights Act (2021)

RRPD Standards and Procedures Manual

**Thompson v. Clark, 596 U.S. Supreme Court (2022)**

Defendant: Ben Parker

**May 5, 2022**

**(Case # 22003470 and Case # 22-004875)**

1.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

2.    Plaintiff was forced to file a report on his child's mother, further referred to as JR, on May 5, 2022 about 10 am.  RRPD Officer Chris Smith wrote that report.

3.    Plaintiff told Smith his fears that his child was being exposed to methamphetamine use in his mother's home, among other concerns. Per 30-6-1 (J) of the New Mexico Criminal Statute,"*Evidence that demonstrates that a child has been knowingly and intentionally exposed to the use of methamphetamine shall be deemed prima facie evidence of abuse of the child.*"

4.    Under the New Mexico Children's Code 32A-4-3 (2019) it is crime to fail to report child abuse to law enforcement.

5.    On May 10th, 2022 RRPD Sergeant P. Rogahn of the Violent Crimes Unit (VCU) thought Plaintiff's well supported allegations were serious enough to warrant an investigation.  Sergeant Rogahn assigned the case to Detective Ben Parker.  The following statements by Plaintiff are taken from Parker's own reports and body cam videos.

6.    The matters to be investigated were that Plaintiff's child was being exposed to meth use

in his mother's home, that the mother was brainwashing the child to call her meth addict boyfriend by a false name, and that the mother was allowing the minor child's 13 year old sister to smoke marijuana and drink alcohol to the point that she was passing out on the floor.

7.     Plaintiff provided self authenticating New Mexico state documents which proved all of the claims, including the mother's own 911 call to the RRPD just 6 months prior where she told them her daughter was smoking marijuana, vape pens, stealing, running away, and had a drug dealer coming by the house to sell her daughter drugs (CAD#21-150720).

8.     In his investigation Parker showed a clear bias against charging Plaintiff's child's mother despite actually verifying all of the allegations and facts in Plaintiff's report.

9.     It was only after the mother was being questioned about the prevalence of drug use in her home, that she and her father made "*similar statements*" that Plaintiff had been inappropriate with her daughter 6-7 years ago but said the child would deny it if asked.

10.     Because of these unfounded allegations, Parker abandoned his assigned mission into the mother's child abuse and instead solely focused on the false allegation that Plaintiff had somehow touched a 6 year old girl innapropriately.

11.     In doing so Parker violated RRPD Procedures Manual for investigation protocol.  Parker should have handed the mothers allegation off to a different detective if he thought it was serious enough.  Instead, he overlooked mother's exposure of her children to meth use, marijuana, and alcohol use in her home.

12.     Parker also overlooked the mother's admission to the brainwashing of our 6 year old child but then accused Plaintiff of coaching the child without any proof or evidence to support it.

13.     At some point Parker pulled Detective John Christopher Miles on the case, but should have known it was Miles who was on the scene when the mother called RRPD due to the her daughter's drug fueled meltdown 6 months earlier. Officer Miles failed to investigate who was dealing drugs to the

child. This further conflict of interest went unreported in Parker's report and subsequent Miles report.

14.     Parker's investigation was complicated by the fact he went out with COVID for weeks.

15.     Parker even lied multiple times in his report about making a referral to CYFD.

16.     Parker erred by conflating two investigations into one and the chaos that ensued led to Plaintiff's child being seized without warrant or order as his investigation left everyone in the dark.

17.     Plaintiff was never notified that Parker was investigating him for the false allegations of touching a child inappropriately. Although it is now clear he was lying telling everyone Plaintiff knew.

18.     Ultimately, Parker's report was found to have been not written contemporaneously, which violates RRPD Procedures manual. Plaintiff has video of Lead Detective Brittany Mahnesmith telling Sheriffs and police officers on June 16th and June 21, 2022 that she was looking at his report and it had nothing in it about Plaintiff being investigated.

19.     Parker was out on COVID during the seizure of Plaintiff's child by RRPD on June 21, 2022. When he caught wind of what confusion he had caused, Parker then retroactively went back and doctored his report on the day after the seizure on June 22, 2022.

20.     Parker's investigation was not legal by RRPD standards, and Plaintiff knows this because he has provided the Court with video when his supervisor, Mahnesmith realized that he had conflated two investigations into one and allowed CYFD unauthorized access into his investigation.

21.     CYFD used that unauthorized access, unlawfully given to them while Parker, who was out for multiple weeks to gain information from a safe house interview of JR's daughter they should have never been a part of. Given free reign they usurped the investigation from RRPD and committed a fraud to retaliate against Plaintiff by opening an unauthorized investigation against Plaintiff. CYFD then used it as a pretense to seize his child on the June 16 by gunpoint and then on June 21 they intimidated RRPD, by use of a fraudulent and unsigned safety plan.

22.     This is why Parker doctored his report to deny ever referring CYFD into his

investigation, because he and his supervisors are aware they illegally seized Plaintiff's child by fraud by use of a unauthorized CYFD safety plan.

23.     Parker is now denying getting CYFD involved in his investigation. This also explains why CYFD never filed a petition with the Children's Court because their involvement into Parker's investigation was unauthorized.

24.     Parker's report now had two separate heads, which is why RRPD has strict protocols against their detectives opening up never ending investigations of their own choosing. Parker's errors show a major malfunction in RRPD chain of command.

25.     The safe house interview for Plaintiff's son was conducted six days after Plaintiff's child was unlawfully seized, and during the interview the child spoke very highly of his father. The interviewer concluded that it was highly likely the boy was coached for the interview by his mom.

26.     Parker again overlooked this fact in his report and glossed over it with a biased pen.

27.     Plaintiff's minor child's 18 year old brother was also interviewed, and he said he never saw anything unusual when Plaintiff lived in his house 6-7 years go.

28.     After these interviews, Parker closed the case into the allegations against Plaintiff, saying it was "***unsubstantiated***".

29.     However, after he and Detective Mahnesmith found out that RRPD officers had unlawfully seized Plaintiff's child, in large part due to Parker's conflated case and CYFD's unauthorized access to the safe house interviews, RRPD initiated a cover up of the highest proportions.

30.     After being cleared of any wrongdoing, Plaintiff's child was returned to him without any apology or acknowledgment by Parker, the RRPD, or CYFD.

31.     This whole time Plaintiff had been desperately trying to contact Parker by calling and going to the RRPD station but was denied every time.

32.     Mahnesmith and Parker then hatched a plan to cover up for Parker's mistake of

conflating two separate investigations into one, so they opened up another unauthorized investigation to further try to frame Plaintiff even though Parker had already unsubstantiated his first case.

33.     Not by accident, Parker called in a call to himself the day after the illegal seizure of Plaintiff's child to avoid RRPD liability if this lawsuit was to ever be filed.

34.     Plaintiff has the report Parker filed on June 22, 2022 where he self generated a case  # and investigation without any supervisor authorization to do so.  This act again is against RRPD Procedure protocols.

35.     The initial report written on the second case was obviously written in a hurry with many typos, errors, wrong dates, and contradicting statements to his first report.  The reason for the errors was that Parker was expecting his child to be born that day and was still out on paternity leave.

36.     Parker generated the second case # himself, wrote the initial report, and signed himself out of the case all at the same exact same time of 2:36 pm.  All of this only took one minute.  Plaintiff knows this by reviewing the activity logs which Parker never imagined Plaintiff would obtain because it was filed as confidential.

37.     After signing out of the case, he then assigns his partner Detective Miles to the case, even though he doesn't have authority to do so.

38.     The second case was a fraudulent case #, cooked up to cover up Parker's liability for the seizure of Plaintiff's child, as the facts show in the reports.

39.     In his report, Miles did nothing more that do a poor job copying Parker's first report and since it was written weeks after the fact and not contemporaneously, it is very flawed and has lots of false statement and obvious typos.

40.     The second case # was a concerted rouse to to make some false allegations by a troubled teenager into a nefarious scheme perpetrated by a dangerous deviant criminal.  The first and second report are full of known lies and fabricated evidences easily disproved by facts.  But these reports were

clearly written thinking that Plaintiff would never see them.

41.    The City of Rio Rancho did their best to stonewall Plaintiff for 6 months from releasing these documents denying multiple FOIA and IPRA requests.  It was only when Plaintiff threatened to sue the City when the documents were suddenly able to be released.

42.    Detective Parker showed immense bias by refusing to charge the child's mother with a crime despite confirming every fact and document in Officer Smith's report.  Parker instead maliciously prosecuted Plaintiff to cover up his own incompetence by filing a second fraudulent case #, which as caused much physical and emotional distress to Plaintiff which is ongoing.

43.    Defendant listed above acted willfully, knowingly, and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights.  As a result of the nature of Defendant's conduct, Plaintiff is entitled to recover punitive damages against the individual Defendant.

44.    Defendant listed above acted willfully, knowingly, and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights.  As a result of the nature of Defendant's conduct, Plaintiff is entitled to recover punitive damages against the individual Defendant.

### COUNT 13

Malicious Prosecution

4th Amendment

New Mexico Constitution Article 2 Sections 4, 10,14, & 18

Civil Rights Act (2021)

RRPD Standards and Procedures Manual

**Thompson v. Clark, 596 U.S. Supreme Court (2022)**

Defendant: John Christopher Miles

**May 5, 2022**

**(Case # 22003470 and Case # 22-004875)**

1.      Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

2.      RRPD Detective John Christopher Miles became involved in Plaintiff's case on October 21, 2021 when he was dispatched to assist RRPD Officer Roman Lujan on a 911 call. Plaintiff's child's mother, JR, told the officers that her child was smoking marijuana, vape pens, stealing, trying to run away, and that there was a drug dealer coming to her house to deal drugs to her 13 year old child.

2.      Lujan and Miles arrive on scene and in less than 30 minutes at 5:09 pm they sign out of the call with the following report,"*neg. on crimes, juvenile is having behavioral issues and not following mothers house rules, child agreed to calm down for the night and stop arguing with mother and grandfather. neg crimes*."

3.      This report is not at all matching the serious allegations made to RRPD by the mother, JR. Plaintiff's own child was there to witness this tragic event and was traumatized by it to this day.

4.      Under New Mexico Criminal Code 30-31-21 it is a third degree felony for any person to "*distribute a controlled substance (marijuana) to a person under the age of eighteen years*."

5.      In the mother's own words, she told John Christopher Miles that felony drug dealing was taking place at her house but Detective Miles never does any investigation into the matter.

6.      This is yet another example of the RRPD unequal treatment under the law. Miles' dereliction into investigating a felony which directly placed the children in JR's home in danger , and made the whole City of Rio Rancho less safe. Miles has one job; to investigate crimes and when he chooses not to do so, for preferential treatment it, undermines the rule of law in New Mexico.

7.      Nor did Miles write any report about the drug dealing to a 13 year old child. Once again we have an RRPD officer sweeping a felony under the rug to protect the mother, JR.

8.      7 months later, Miles was brought into Detective Parker's investigation into the false allegations made by the mother and her daughter regarding inappropriate contact.

9.      However, Parker totally omits the fact that that Miles was on the call detailed with the

54

same mother and her daughter just 6 months before. Miles also omits that fact from his subsequent report as well. That information would be most crucial in their investigations.

10.    Plaintiff was very critical of RRPD on May 17, 2022 in his initial interview with Parker about his departments handling of the lack of investigation into who was selling the 13 year old child drugs as Plaintiff rightly was concerned that the lack of investigation put his own child in harms way.

11.    Plaintiff, however, was unaware that he was actually criticizing Parker's partner, Detective Miles. This in turn provided the motive as to why Parker, after his call with Plaintiff, became very biased in his investigation into the mothers child abuse, and instantly turned it around on Plaintiff trying to charge him with child abuse from a mere unfounded allegation 7 years earlier.

12.    Parker became biased because he knew, or should have known, that his co-Detective was legally compromised and he could be implicated personally. This also explains why Parker and Miles then closed Parker's first case and, without authorization, opened up a hasty second case to eliminate the potentiality of any later allegations of investigational misconduct.

13.    Miles and Parker were well aware that Plaintiff had also made multiple visits to the RRPD police station to voice his concern as to why they were not investigating a felony drug deal to a 13 year old child in the same house his own child lives in.

14.    This provided motive for Miles' to open a malicious prosecution against against Plaintiff, which is evidenced by his inaccurate reports.

15.    Miles is listed as a detective on Parker's first report, and therefore he also allowed CYFD to have unauthorized access to the RRPD investigation. CYFD had no authority to be involved in Parker and Miles' investigation because they had no intake case number to do so.

16.    Miles' allowed CYFD to usurp his investigation at his direction as the other detective, Parker, was out the whole time with COVID and paternity leave

17.    The evidence points that Miles conspired with CYFD to illegally seize Plaintiff's child

by gunpoint without any warrant, petition, or court order on June 16 and on June 21.

18.    Miles shared private details with CYFD caseworkers that should have been confidential.

19.    This fact is proven because Plaintiff has provided the Court with videos from June 16 and 21 where Detective Brittany Mahnesmith is reading Parker's report and they had no mention of any safety concern between Plaintiff and his child. CYFD could have not gotten that confidential from any source other than Detective Miles.

20.    By the date of June 21, 2022 Detective Miles had never reached out to Plaintiff for an interview other than calling him once from an unknown number, which Plaintiff's phone doesn't accept.

21.    Despite not ever interviewing Plaintiff, the evidence points that Miles was engaged in a conspiracy to seize Plaintiff's child and engage in a malicious criminal prosecution as well.

22.    The day after RRPD unlawfully seized Plaintiff's child, Mahnesmith, Parker, and Miles concocted a scheme to alleviate their obvious liability by opening up another case # to try and legitimize their sloppy investigation into Plaintiff.

23.    On June 22, 2022 Parker self generated a case #, wrote the initial report, assigned Miles to that case, and signed himself out of that case all in about one minute at 2:36 pm.

24.    The next task they needed to do was for Miles to copy all Parker's first report onto the new case #. Obviously, what Miles wrote in the second case was not written contemporaneously, as the RRPD Manual instructs their officers to do so. Also in the RRPD Manual it does not say that a Detective can generate his own case # to open an investigation and then assign it to another detective.

25.    Parker's opening of the second case # against Plaintiff, and the following report by Miles was a fraud, purposely committed by three RRPD Detectives who were trying to relieve their own liability from the lawsuit they knew was coming by Plaintiff for the illegal seizure of his child.

26.    Parker's first report remained open for another six days after he opened the second case # . The first case # was closed on the June 29, 2022 and his supervisor Peter Roghan signed off to close

the case on July 2, 2022. Meanwhile, the second case was opened on June 22, 2022 and signed off by Miles and Mahnesmith on July 14, 2022.

27.    Miles report is strangely enough not a word for word recount but is Mile's obvious attempts to take Parker's report and make it sound even more nefarious and damning against Plaintiff.

28.    Miles' report featured no new investigation at all. Mile's adds nothing new to Parker's first investigation. Most importantly, Miles' never even tries to set up an interview with the very person he is supposedly investigating for criminal sexual contact with a minor, which is the Plaintiff. Miles' begins and closes his investigation in the span of 19 days in which he never interviews Plaintiff at all.

29.    However, Miles knowingly lies in his report,"***On July 5 and July 7, 2022 I attempted to contact Jarrod. I was unsuccessful in making any contact with Jarrod and he does not allow messages on his phone. Det. Parker told me that he had been unsuccessful contacting Jarrod at the end of his investigation...***"

30.    Plaintiff has submitted to the Court an exhibit showing Plaintiff emailed Parker on June 17, 2022 and made calls to Parker while he was out on COVID. Parker never tried contacting Plaintiff.

32.    Miles concludes his strange report by admitting that JR's daughter, who supposedly made the allegations, was not even willing to cooperate with his investigation,"***Should (JR's daughter) ever to decide to cooperate with Law Enforcement and make a statement or further pertinent information is learned....This case should be considered closed...***"

33.    Miles filed a malicious criminal case against Plaintiff knowing it was unsupported by evidence. He and Parker omitted evidence from their reports to absolve JR of any criminal charges.

34.    On June 21, 2022 Plaintiff has provided the court with an audio cd of his trip to RRPD front desk and made contact with Officer Chris Smith. Plaintiff is again trying to contact Parker.

35.    Plaintiff never hears back from Parker and on July 19, 2022 at about 2:30 pm Plaintiff demands a meeting with Parker at the RRPD police station. After waiting for some time, Parker finally

appears and gives Plaintiff permission to take his phone back with him into an interrogation room.

36.    Plaintiff has provided Court the Miles' body cam video of the following interview with Parker and Miles.

37.    The date of the interview with Parker and Miles was 17 days after the close of the first report and 5 days after Miles closed his second report.  Plaintiff had never once met either officer.

38.    Plaintiff asks Parker how CYFD got involved, he lies and said he thought Plaintiff did.

39.    Parker admits on video to never having reviewed the case of false reports against JR.

40.    At 2:58 pm on his own video, Plaintiff again brings up that RRPD had failed to investigate the felony drug deal involving the drug deal, Miles can be heard on his video saying that a 13 year old smoking marijuana is a *"civil matter"*.

41.    At 3:03 Plaintiff can be seen on video telling Parker and Miles that JR filed a naked picture of him which is a crime in New Mexico under statute 30-37A-1.  The do nothing about it.

42.    About 3:06 pm on his own video Miles says to Plaintiff,"*So we are not here for civil matter we are here for criminal.  That civil stuff is not the police department's job*."  On November 23, 2022 Miles about 10:38 am Miles and a RRPD CVAU officer can be seen both giving JR civil legal advice.  Miles about 10:43 am says to JR,"*The Judge could end up revoking his (Plaintiff) rights*."

43.    About 10:44 November 23, 2022 JR can be seen on Miles' lapel video asking the CVAU officer,"*Would you be willing to meet with my lawyer?*"  To which she replies,"*Sure, definitely.*"

44.    Plaintiff has given the court multiple forms of evidence showing Miles' obvious bias in his case which was undertaken to maliciously prosecute Plaintiff knowing the is no evidence against him.  Miles' actions have cause Plaintiff much physical and emotional harm and is ongoing to this day.

45.    Defendant listed above acted willfully, knowingly, and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights.  As a result of the nature of Defendant's conduct, Plaintiff is entitled to recover punitive damages against the individual Defendant.

## COUNT 14

Unequal Treatment Under The Law

14th Amendment

New Mexico Constitution Article 2 Sections 4, 10,14, & 18

Civil Rights Act (2021)

RRPD Standards and Procedures Manual

**A.N. V. Syling, 928 F.3d 1191 (10th Circuit, 2019)**

Defendant: Marie Posey

**April 19, 2023**

1.      Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

2.      On April 18, 2023 Plaintiff's mother decided to make a visit to the RRPD and ask to speak to the CVAU, a special task force dealing with domestic violence victims.

3.      Plaintiff's mother, who is almost 70 years old, and felt that she was being victimized by the lies being told to the RRPD by JR over the last 7 years.

4.      About 1:15 pm, Plaintiff's mother then sat down with RRPD CVAU Officer Marie Posey.

5.      Plaintiff's mother said she was there to inform the CVAU that their preferential treatment they were giving JR and how JR was using their department as a weapon against her and her son.

6.      Plaintiff's mother telling Posey that she and her son were the real victims, and that she was there to tell the CVAU that JR is lying to them without any proof.

7.      Posey immediately began interrupting Plaintiff's mother and doubting every fact that she was telling Posey.

8.      Posey at multiple times through the short meeting continued to tell Plaintiff's Mother she would not help her because she lived in Albuquerque.  Plaintiff's Mother kept trying to tell her that the

59

crimes were happening in Rio Rancho.

9.    Plaintiff's mother could see how biased Posey was as she knew JR's name and she was

assuming that JR was a victim.  Plaintiff's mother asked Posey for any proof and she could not provide

any proof but instead kept trying to get her to leave.

10.    Plaintiff's mother then got tired of talking circles and being victim denied.  Posey

assured her she would sit down anytime with her son (Plaintiff) and gave her a card for him to call her.

11.    Plaintiff's mother relayed the meeting to Plaintiff and was very disheartened by the way

she was treated by Posey.

12.    Plaintiff got the card and called and left message with Posey at 3:06 pm on April 18,

2022.

13.    Posey returned Plaintiff's call on April 19, 2022 at about 10:37 am.  The call lasted for

20 minutes.

14.    Plaintiff began to explain why he would like to sit down with Posey because he has been

a victim for 7 years to JR's relentless attacks against him using RRPD officers and especially CVAU.

15.    After a couple minutes Posey rudely interrupted Plaintiff and said she had looked into

the history of Plaintiff and started to deny the fact that he was the victim just as she had done Plaintiff's

elderly grandmother the previous day.  Posey would continue to deny Plaintiff any help and so he asked

if Posey could allow him to come in the RRPD station and show her the pile of evidence he has.

16.    Posey then said she would only give him 15 minutes of her time to which Plaintiff

informed her he didn't work for her and that she wasn't treating him the same as CVAU was treating JR.

17.    Plaintiff asked if Posey could give him more time to which she said she would put him

on a strict 15 minute timer and once it went off that she would walk away.  Plaintiff was beside himself.

18.    Plaintiff is clearly being treated unequally as they are treating JR.  This is evidenced by

his video exhibit showing a CVAU officer and Detective Miles who believe every word JR says despite

having any supporting evidence.  On the video the officers can even be seen giving JR legal advice.

19.    About 10:37 pm on November 23, 2022 Posey's fellow CVAU officer can be seen on Miles' lapel camera video saying to JR,"*So we can try to do another restraining order, it is most likely going to be denied but we can try it if that is something you wanna do...they are probably going to deny it.*"  This video shows the contrast of how JR is being encouraged to make further false claims against Plaintiff without any evidence while treating Plaintiff as if he is guilty of heinous crimes and refusing to look at his exculpatory evidences.

20.    After this biased encounter with Posey, Plaintiff became resolved to file this lawsuit. The actions of Marie Posey have only further caused Plaintiff more physical and emotional harm and is considered ongoing.

21.    Defendant listed above acted willfully, knowingly, and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights.  As a result of the nature of Defendant's conduct, Plaintiff is entitled to recover punitive damages against the individual Defendant.

## COUNT 15

Interference With Parent/Child Relationship

14th Amendment

New Mexico Constitution Article 2 Sections 4, 10,14, & 18

Civil Rights Act (2021)

RRPD Standards and Procedures Manual

**Santosky v. Kramer, 455 U.S. 745, 102 S. Ct. 1388**

Defendant: Cheryl Johnston

at La Petite Daycare Parking Lot (**CAD# 22-004855**)

Ex-Parte Young Claim

1.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

2.    About 8:30 pm on June 21, 2022 RRPD Officer Dave Portis received a call from Judge

Cheryl H. Johnston, regarding clarification on her District Court Order which states that Plaintiff was entitled to pick up his child at that time however the child's mother has brought up a unsigned safety plan to the daycare saying he was not allowed to pick up his child.

3.    About 8:30 pm Judge Johnston can be heard and seen on Portis' lapel video acknowledging who Plaintiff was and made several comments and jokes about Plaintiff.

4.    About 8:30 pm Portis tells the Johnston,"*I'm reading the safety plan, I'm not really happy with it.*"

5.    About 8:30 pm Portis tell Johnston that the Sheriff's visited Plaintiff's house with,"*intent of removing the child due to the safety plan. Somehow during that process they decided Jarrod could keep the child.*"

6.    About 8:31 pm Portis tells the Judge,"*I don't know which of these two to enforce, which one supersedes the other. I don't have the answer to that question. Basically, this is his time to pick up the child form La Petite, that is what the court order says, and I have verified.*"

7.    About 8:38 pm Portis admits to the Judge,"*I've called the detectives, they are not sure.*"

8.    About 8:39 pm Johnston tells Portis to break her own court order. "*I am able to enforce the safety plan over your court order based on the change in circumstances since you signed the order. Okay, perfect.*"

9.    About 8:40 Portis tells Johnston,"*You are aware that he is probably going to be at the courts at 8 o'clock in the morning.*" To which Johnston can be seen and heard telling Portis; Plaintiff is going to sue everyone on the scene for seizing his child, and also that Plaintiff will also throw her name in the lawsuit as well.

10.    About 8:43 pm,after Portis gets off phone with Johnston, he tells Officer N. Army,"*She (Johnston) was like, my court order is my court order. However, CYFD has intervened, they deemed the situation has escalated where they need to override my court order and per law, they can do so.*"

11.    Army tells Portis,"*says THEY can, but they need us to do it and they are putting all the liability on us.*" To which Portis replies,"*She (Johnston) says as far as she is concerned that CYFD is making the call here and that the safety plan can override her court order.*" Army then asks,"*And who is going to be getting sued for that, according to the Judge, CYFD or us?* " Portis answers,"*Both*."

12.    Judge Johnston does not explain, at any point, to Portis the process of confirming exigent circumstances through an affidavit in order for her to issue an emergency ex-parte order.

13.    By law, Johnston would have had to issue an emergency ex-parte order to seize the child but that never happened.

14.    Johnston, being a Judge of the New Mexico children's court knew that her actions were unlawful and contrary to any state law within the New Mexico Children's Code and to Plaintiff's 4th and 14th Constitutional Rights. Johnston defied law and willfully acted in disregard for the law.

15.    Per New Mexico Children's Code 32A-4-4, child abuse and neglect proceedings begin with a petition being filed to the Children's Court. Johnston knew that that never happened.

16.    Per New Mexico Children's Code 32-A-4-4(d) When a child is taken into custody, the department shall file a petition within two days or be released. Johnston knew that never happened.

17.    Per New Mexico Children's Code 32A-4-12, protective orders must be applied for by a children's court attorney and each party shall be given 48 hours notice. That never happened.

18.    Per New Mexico Children's Code 32A-4-15, Plaintiff's child would have had to be represented by a children's court attorney. Johnston obviously knew that never happened.

19.    Per New Mexico Children's Code 32A-4-16, the children's court attorney would have had to file a petition and then, only upon a sworn written statement of facts showing probable cause existed to believe the child is abused or neglected, the children's court judge would have had to issue an ex-parte order to seize child. Johnston obviously knew that never happened.

20.    It was Johnston's responsibility as a New Mexico District judge to explain the process of an emergency court order to Officer Portis. She failed in her duty to inquire any of the circumstances of the seizure but Portis did tell her,"*I'm reading the safety plan, I'm not real happy with it.*"

21.    New Mexico Code of Judicial Conduct Rule 21-109 strictly prohibits ex-parte communications. Johnston was never told by Portis there was any grounds for Johnston to reasonably believe there was any emergency necessitating the seizure of the child.

22.    New Mexico Code of Judicial conduct Rule 21-109(A)1(b) says,"*the judge makes provision promptly to notify all other parties of the substance of the ex-parte communication, and gives the parties an opportunity to be heard.*" Johnston failed to adhere to this rule.

23.    New Mexico Code of Judicial conduct Rule 21-109(A)5 says,"*A judge may initiate, permit, or consider any ex parte communication when expressly authorized by law, rule, or Supreme Court order to do so.*"

24.    In *In RE NAJARO, 2013-NMSC-026,* the New Mexico Supreme Court put all of it's lower courts and Judges on notice that ex-parte communications will not be tolerated. Johnston knew this and still defied the laws of New Mexico by her actions.

25.    Johnston's actions on June 21, 2022 violated ABA Rule 2.9(A).

26.    In the American Judicature Society's *Ethical Standards For Judges,* it reads,"*In an ex-parte communication, a judge may receive inaccurate or incomplete information that might easily be corrected if all parties had been present.*" This is exactly what happened by Johnston's actions.

27.    Johnston showed bad faith in her ex parte communication by never making a record of it inside Plaintiff's custody case. Johnston has an obligation as a judge to notify both parties of the nature of her ex parte communications. Instead, Johnston tried to cover up her actions.

28.    Johnston also did not have jurisdiction to tell the officers they could seize the child as Plaintiff's successful appeal was not yet officially mandated back from the New Mexico Court of

Appeals to the Sandoval County 13th District Court by June 21, 2022.

29.     Plaintiff now contends that Johnston retaliated against Plaintiff for his successful appeal reversing the Judge's unlawful order by telling known lies to Officer Portis in order to cause him to seize Plaintiff's child.  Plaintiff had one of Johnston's orders officially reversed just 34 days before the seizure.

30.     Plaintiff was at the time unaware that Officer Portis talked to Judge Johnston.

31.     Plaintiff filed an emergency motion to show cause with the Court just three days after his child was seized on June 24, 2022, and in that motion Plaintiff informed Johnston about the details surrounding her court order being broken by the child's mother, JR, through false allegations.

32.     Johnston failed in her duty to make judicial notice of her ex-parte communications with Portis, and attempted to cover it up after it was found that Plaintiff was found to not have abused any child.

33.     Plaintiff during the next six months made multiple FOIA requests to the City of Rio Rancho to acquire the lapel camera footage and was being unlawfully denied those requests.

34.     On October 17, 2022 Plaintiff filed a motion asking Judge Johnston to subpoena those videos as the City of Rio Rancho had instructed him to do.  The Judge never set up a hearing for the emergency motion and never responded to the motion to subpoena the records because she knew she would be implicated as an accomplice in the conspiracy to seize Plaintiff's child on June 21, 2022.

35.     Johnston knew her actions were unlawful and that is why she never reported it to the Court or her Chief Judge Eichwald.

36.     Plaintiff was not aware of this judicial deception at all by the time of the objection hearing which the New Mexico Court of Appeals mandated Johnston to hold.  Plaintiff was again rudely rebuffed by Johnston as she held an unconstitutional hearing in which she issued a no contact order against Plaintiff with absolutely no evidence to do so.  Plaintiff afterwards filed another appeal.

37.    Before the appeal, Johnston had set a hearing on April 11, 2023 to resolve several pending motions, including Plaintiff's emergency motion to show cause why Plaintiff's child was seized by JR. Plaintiff filed his notice of appeal on December 2, 2022 and so the court had no jurisdiction.

38.    On April 1, 2023 Plaintiff was shocked when the opposing lawyer sent him exhibits for the upcoming hearing on April 11, 2023. Plaintiff told the lawyer the Court lacked jurisdiction while on appeal and the lawyer told Plaintiff that Johnston was intending to hold the hearing anyway.

39.    Shortly before learning that Johnston was intending to hold the hearing without jurisdiction, Plaintiff had finally secured the RRPD lapel camera videos of the officers after 9 months.

40.    Plaintiff was shocked when he viewed those videos and it showed Officer Portis actually talking to the judge as she told him a knowing lie in order for him to seize Plaintiff's child.

41.    Even the opposing counsel agreed with Plaintiff that the Court totally lacked jurisdiction to hold a hearing on April 11, 2023.

42.    Plaintiff also made the court aware that Johnston's trial administrator did shorten the hearing on April 11, 2023 from 4 hours to 3 hours by way of seemingly ex parte communication with the opposing lawyer without her filing any motion to do so with Johnston. This is evidence by the administrator who listed "RS" (respondent) as the party who requested the hearing be shortened.

43.    Plaintiff finally was granted a continuance after pleading with the Court that they didn't have jurisdiction but it was only continued at the very last second.

44.    Currently, Plaintiff is somewhat relived that Johnston doesn't have jurisdiction because he is rightly suspicious of Johnston as a neutral magistrate at this point.

45.    Judge Johnston has broken all state and federal judicial codes by her actions to unlawfully participate in the seizure of Plaintiff's child on June 21, 2022. Plaintiff also has pending motions in the Court making her a material witness to, which makes the Judge a conflict of interest.

46.    Plaintiff now respectfully asks for the emergency prospective injunctive relief that Judge

66

Johnston be ordered not to further conspire to deprive Plaintiff of his 1st liberty interest, his child, without due process and further that the Court issue an order of her recusal from Plaintiff's custody case.

47. About 8:58 pm on June 21, 2022 Plaintiff asks Portis,"***Is she (Johnston)going to make an order of that***?" To which Portis replied,"***No***."

48. Cheryl H. Johnston's actions have cause much physical and emotional harm.


## JURY DEMAND

1. Plaintiff hereby demands a trial by jury.


## EMERGENCY INJUCTIVE RELIEF

Plaintiff now requests the Court to grant him an emergency order of injunctive relief from the from the RRPD Officer Defendants listed above. Plaintiff was forced to file this federal complaint in fear for his and his child's safety. Plaintiff does not feel safe in his own home due to the knowledge that he lives in a county where all local authorities have proven themselves to be apt to unlawful behavior.

Plaintiff also fears that by filing this complaint he will face a retaliation by the above implicated authorities such as Rio Rancho Police Department and Judge Cheryl H. Johnston. These local authorities have tried to silence Plaintiff's truth and free speech. In prior appeals to each authority, Plaintiff has informed them of his deprivations and each of those authorities are now conspiring against Plaintiff for the reasons as detailed above.

Plaintiff is a lawful citizen of Rio Rancho, New Mexico in Sandoval County and has never been convicted of a crime in his whole life. Plaintiff's truth has never once been called into question by any

of the local law enforcement agencies. Plaintiff has a constitutionally protected right to life, liberty, and the pursuit of happiness. Plaintiff currently is living in an environment in which Sandoval County authorities are failing to provide that to Plaintiff.

Plaintiff now pleads to the Court for injunctive relief from retaliation by RRPD and Judge Cheryl H. Johnston. Plaintiff now prays to the Court for a speedy resolution of Plaintiff's immediate safety concerns. The specifics Plaintiff now asks the Court to consider are as follows;

Plaintiff respectfully requests a preliminary injunction based on the following;

1.    Plaintiff believes the following:

(a) The Plaintiff believes in the likelihood of prevailing on the merits of said complaint.

(b) Irreparable injury to Plaintiff has already occurred and will continue if relief is not granted;

(c) The threatened injury to the Plaintiff outweighs whatever damage the proposed injunction may cause the opposing party.

(d) Balancing of equities (see 1a above).

Plaintiff now asks the Court to order each defendant to stop its course of action to prevent possible injustice and irreparable harm to the plaintiff and his liberty interests.

Plaintiff asks that the order binds only the following who receive actual notice of it by personal service or otherwise:

(A) the parties

(B) the parties' officers, agents, servants, employees, and attorneys; and

(C) other persons who are in active concert or participation with anyone described in Rule 65 (2) (a) or (b)

The specific act or acts restrained shall pertain to each defendant and/or the entity to which each

68

are employed. This restraining order is for and pertains to the Plaintiff. The specific acts to which each defendant is to be restrained from, are as follows:

1.      Each of the Defendants to be restrained from any, and all, types of surveillance or confiscation of, by any of the defendants to include: electronic, electronic communications and physical surveillance (includes drones and wiretaps).

2.      Each of the Defendants to be restrained from any, and all, types of communication by any of the defendants, to include: phone, email and in person, public contact.

3.      Each Defendant to be restrained from coming onto Plaintiff's property for any reason, unless for an emergency situation requiring law enforcement initiated by Plaintiff. Plaintiff's property includes search and seizure of Plaintiff's property, which includes his highest protected liberty interest; his minor child.

4.      Each Defendant to be restrained from firing weapons onto Plaintiff's property from public roads, for any reason. In addition, each Defendant is forbidden to fire any type of weapon at Plaintiff, towards Plaintiff, Plaintiff's vehicle or other property, whether at his home or in any public place in all of New Mexico.

5.      Each Defendant to be restrained from further conspiring with the other defendants, and their corresponding agencies in any action towards Plaintiff.

Plaintiff has shown the Court, through, his factual complaints, as asserted above and sworn to below, the necessity of a emergency injunction to protect the Plaintiff from further constitutional deprivations by the above named Defendants . Those above defendants have been served by Plaintiff's process server, therefore giving the Court jurisdiction to issue emergency injunctive relief on behalf of Plaintiff.

## REQUEST FOR RELIEF

Plaintiff incorporates the preceding paragraphs by reference herein.

In addition to the Emergency Injunctive Relief, Plaintiff also seeks the following relief:

1. Actual and compensatory damages sufficient to make him whole.
2. Punitive damages against Defendant's sufficient to punish them and to deter further unconstitutional acts and misconduct.
3. Treble damages.
4. Emergency prospective relief against Defendant Cheryl H. Johnston, to include an order prohibiting her from unlawfully seizing Plaintiff's 1st liberty interest, his minor child, without due process. Plaintiff also asks the Court to issue an order of recusal against Cheryl H. Johnston in the custody case due to her unlawful and unconstitutional actions on June 21, 2022 and afterwards, resulting in the unlawful seizure of Plaintiff's child and cover up, which is ongoing.
5. Litigation expenses, costs, pre- and post-judgment interest as provided by law, and:
6. Such other and further relief as the Courts deems just and proper.

By undersigning, Plaintiff certifies that the information within this document is true to the best of his knowledge and belief, and is in accordance with the factual evidences in his possession; which he vows to share freely with the Court.

Jarrod Lowrey
P.O. Box #45424
Rio Rancho, New Mexico 87174
jlowrey6886@hotmail.com